T.C. Memo. 2016-233

UNITED STATES TAX COURT

PHYLLIS E. MCGRADY AND CHRISTOPHER R. ANTONIACCI, Petitioners
v. COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 20602-12, 11142-13.　　　　Filed December 22, 2016.

John Paul Barrie, for petitioners.

Jonathan E. Behrens, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

LAUBER, Judge:  On their Federal income tax return for 2007, petitioners reported a noncash charitable contribution of $4.7 million.  This contribution comprised two distinct gifts, which were components of a complex conservation plan in Bucks County, Pennsylvania.  Petitioners donated to the township in which they lived a qualified conservation easement on their 25-acre homestead property, and

[*2] they donated to a tax-exempt conservation organization a fee simple interest in an adjoining 20-acre parcel of undeveloped land.  Unable to use this deduction fully in 2007, they claimed carryover charitable contribution deductions for 2008-2011.

The Internal Revenue Service (IRS or respondent) disallowed these deductions in full.  It contended that petitioners lacked donative intent; that they failed to satisfy various reporting requirements; that they overvalued the donated property; and that they received return benefits in exchange for their gifts.  The IRS determined deficiencies as follows:

| Year | Deficiency |
| --- | --- |
| 2007 | $338,614 |
| 2008 | 308,960 |
| 2009 | 260,405 |
| 2010 | 506,296 |
| 2011 | 86,102 |

The IRS also determined accuracy-related penalties under section 6662(h), computed as 40% of the underpayments, and in the alternative under section 6662(a), computed as 20% of the underpayments.[1]  We conclude that petitioners are entitled to charitable contribution deductions for both gifts, albeit in amounts

---

[1]All statutory references are to the Internal Revenue Code (Code) in effect for the tax years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.  We round all monetary amounts to the nearest dollar.

**[*3]** smaller than they claimed, and that they are not liable for accuracy-related penalties.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and the attached exhibits are incorporated by this reference. Petitioners resided in Pennsylvania when they filed their petitions.

A.    Petitioners' Acquisition of Parcel A and Parcel B

In 1994 Edward and Sarah Rorer owned 182 acres of land in Upper Makefield Township in Bucks County, Pennsylvania (Township). This land comprised five contiguous but separate tax map parcels. What we will call Parcel B or the homestead property was a 25-acre tract of partially improved land. It included a single-family residence, dating in part to the 17th century, and several nearby outbuildings. The outbuildings included a cottage, a guest house, garages, and a large barn once used as an airplane hangar. This residential complex was located toward the southern border of Parcel B. What we will call Parcel A was a 20-acre tract of unimproved land that adjoined Parcel B to the west.

The remaining 137 acres, comprising three separate tax map parcels, surrounded Parcels A and B to the west, south, and east. We will refer to this acreage as the Rorer Tract. The Rorer Tract was undeveloped, consisting of woodlands

[*4] and cleared land used for farming. The Rorer Tract, like Parcels A and B, was zoned "CR-1" by the Township. This meant that all 182 acres could be developed as of right into single-family homes with a minimum lot size of one acre.

In February 1995 petitioners purchased Parcel B from the Rorers for $1.5 million. At the time of purchase the Rorers granted petitioners an informal, unrecorded easement to use a gravel farm road across the Rorer Tract. This road provided a back entrance to the homestead property from Aqueduct Road, which bounded the Rorer Tract to the south. Petitioners used this back entrance during severe winter weather, when the main driveway leading to the residence from the north could become impassable.

At the time they acquired Parcel B, petitioners also received from the Rorers an option (exercisable within 5 years) to purchase Parcel A and an option (exercisable within 10 years) to purchase the Rorer Tract. In November 2000 petitioners exercised the former option and purchased Parcel A for $500,000. We will sometimes refer to Parcels A and B collectively as the McGrady/Antoniacci Tract.

In January 2005 petitioners informed the Rorers of their intention to exercise their option to purchase the Rorer Tract. The option agreement stipulated that the purchase price was to be the average of three independent appraisals of that

**[*5]** property. The local real estate market was extremely strong during 2003-2005; the Rorers had received offers for the Rorer Tract substantially in excess of $10 million from several developers. The average of the three appraisals stipulated in the option agreement yielded a required purchase price of $13.4 million. Petitioners could not afford this price, and in July 2006 they terminated the option agreement.

B.    Development of the Environmental Conservation Plan

The Township was committed to protecting land in its natural state and preserving as far as possible the agricultural heritage of Bucks County. It sought to accomplish these goals in various ways, e.g., by purchasing or receiving conservation easements and by providing incentives for "conservation subdivisions." Conservation subdivisions allowed limited residential development: Expensive homes would be dispersed across a large area, with the land surrounding these residential "envelopes" being covered by conservation easements.

Between 1996 and 2005 the Township's residents authorized bond issuances of up to $31 million to raise funds for preservation of open space. To guide the use of these funds, the Township, a governmental unit as defined in section 170(c)(1), developed an "open space plan" in consultation with the Heritage Conservancy (Heritage), a nonprofit organization dedicated to environmental conser-

[*6] vation in Bucks County and adjoining areas.  Heritage is tax-exempt under section 501(c)(3) and is an organization eligible to receive "qualified conservation contributions" under section 170(h)(1) and (3).  In May 2005 the Township and Heritage identified the Rorer Tract and the McGrady/Antoniacci Tract as among the most significant unpreserved properties remaining in the area.

Petitioners shared the Township's conservation values.  In December 2005 they contacted Heritage to express their interest in preserving the Rorer Tract, which they then held an option to purchase.  In January 2006 they hired Gregory Glitzer, an experienced civil engineer, to outline possible development scenarios.  He prepared numerous sketch plans.  He advised that if all 182 acres were developed to their full commercial potential, they could accommodate at least 60 residential units and (under a "cluster development" model) possibly as many as 218 residential units.  He sketched plans for a 9-lot residential development on Parcel A and a 10-lot residential development on Parcel B.

As an alternative, Mr. Glitzer in March 2006 sketched plans for a nine-lot "conservation subdivision" carved out of the Rorer Tract and the southern portion of Parcel A.  Under this plan, the McGrady/Antoniacci Tract would be enlarged to include a portion of the Rorer Tract not needed for the proposed subdivision, and a

**[\*7]** conservation easement would be placed over all of petitioners' property except the residential envelope on Parcel B.

In early spring 2006 Richard Zaveta, an experienced local developer, expressed his willingness to pay $6 million for eight building lots as shown on Mr. Glitzer's sketch for the Rorer Tract, with the ninth lot being sold to another party. The Township gave preliminary approval to this sketch plan. It also expressed its willingness to contribute at least $4 million to purchase a conservation easement over the Rorer Tract, conditioned on petitioners' conveying conservation easements over Parcels A and B.

Subsequent negotiations among the parties were affected by two developments. First, petitioners terminated the option agreement in July 2006 because they could not afford the $13.4 million purchase price for the Rorer Tract. Second, Mr. Zaveta sensed that the housing market was weakening and insisted on scaling back his commitment. This meant that he would require more than the eight lots initially envisioned and would pay substantially less for each lot.

Lengthy negotiations ensued among petitioners, the Rorers, the Township, Heritage, Mr. Zaveta, and their various representatives. On December 11, 2006, Mr. Glitzer prepared the final conservation subdivision plan, which reflected the parties' ultimate agreements. The elements of this plan, which were

[*8] implemented in various steps during the following months, can be summarized as follows.

• Petitioners agreed to convey to Heritage, as a charitable contribution, a fee simple interest in Parcel A. They executed a donation agreement dated January 24, 2007, and the deed was recorded in Heritage's name on February 7, 2007. Heritage agreed to deliver to the Township, and subsequently did deliver for consideration of $100,000, a conservation easement over Parcel A.

• Petitioners agreed to convey to the Township, as a charitable contribution, a conservation easement over Parcel B. They executed a donation agreement to this effect on February 1, 2007, and formally conveyed the easement on July 10, 2007. Petitioners retained the right to make improvements to their residence and the existing outbuildings within a two-acre residential envelope.

• The Rorers agreed to sell to the Township, for $5,615,000 in a bargain sale, a conservation easement over the Rorer Tract. Heritage agreed to purchase the Rorer Tract from the Rorers, subject to this easement, for $6,085,000. The sum of these amounts, plus the tax savings the Rorers anticipated from the bargain sale, approximated the $13.4 million purchase price for the Rorer Tract that had been determined under the original option agreement. The initial agreements were

[*9] executed on February 1, 2007; the easement was formally conveyed on June 28, 2007; and the deed was formally executed on July 10, 2007.

• Heritage, as the owner of Parcel A and the Rorer Tract, agreed to sell to Mr. Zaveta 10 residential lots as set forth in the final conservation subdivision plan, in exchange for consideration of $5,175,000. Heritage concurrently agreed to sell an 11th lot to an unrelated party for $425,000. The initial agreements were executed on February 1, 2007. The Township's board of supervisors formally approved the final conservation subdivision plan on June 6, 2007, and the relevant deeds were formally executed on July 10, 2007.

• Petitioners agreed to donate, and did donate in the form of cash and common stock, $275,000 to Heritage to cover its transaction costs in acquiring the Rorer Tract and securing development approval from the Township. Of this sum, $268,000 was contributed during 2007.

The agreements described above left the parties $485,000 short of the total needed to meet the requirements set by the Rorers and Mr. Zaveta. To enable the deal to close, petitioners agreed to purchase from Heritage, for $485,000, a 37-acre parcel of land carved out from Parcel A and the Rorer Tract. Heritage had no interest in owning this land outright. It offered this acreage to Mr. Zaveta, but he declined. He explained that home buyers in this market were typically satisfied

[*10] with a five-acre lot; that they would not pay appreciably more for additional acreage subject to a conservation easement; and that ownership of such acreage would require the homeowners' association to charge substantial additional fees to cover maintenance, security, and insurance costs.

We will refer to this 37-acre parcel as the buy-back parcel. Mr. Zaveta and an official from Heritage testified that this parcel represented land that was in effect "left over." This land was not needed for the conservation subdivision given the location of the 10 residential envelopes, which were situated along the access road on the southern and western portions of Parcel A and the Rorer Tract. And this land could not be used for any other development purpose because it was fully covered by conservation easements.

By purchasing the buy-back parcel, petitioners acquired a U-shaped tract of land, completely subject to conservation easements, that surrounded Parcel B, their homestead property, to the west, south, and east. As a result of this acquisition, petitioners increased their aggregate land ownership from 45 acres (Parcel A + Parcel B) to 62 acres (Parcel B + buy-back parcel). The ultimate configuration of petitioners' real estate thus came to resemble, to some degree, the configuration envisioned in Mr. Glitzer's March 2006 sketch, which called for the partition of

[*11] Parcel A and the enlargement of petitioners' homestead property to include undeveloped portions of Parcel A and the Rorer Tract.

In July 2007 Heritage and Mr. Zaveta submitted to the Township a detailed development proposal for the new subdivision, which was to be called Creeks Bend. This proposal included a private access road for the 10 new residences, which would be placed (to the extent possible) on top of the old gravel farm road that ran through the Rorer Tract. This placement of the road was designed to maximize conservation values by minimizing disruption of pristine land.

Petitioners were granted a formal, recorded easement to use this access road, on essentially the same terms as applied to their prior use of the gravel farm road. Petitioners paid nothing for this easement, and they were not required to contribute either to the cost of constructing the access road or to the costs of annual maintenance and upkeep (such as snow removal). Petitioners continued to use this access road as a back entrance to their property during winter weather and occasionally to bring in heavy farm equipment.

C. Tax Return and Examination

Petitioners timely filed their 2007 Federal income tax return reporting a noncash charitable contribution of $4.7 million. This amount reflected a valuation of $2.35 million for the donation of Parcel A to Heritage and a valuation of $2.35

[*12] million for the donation of the conservation easement to the Township. Petitioners included with their return properly executed Forms 8283, Noncash Charitable Contributions, covering both gifts, as well as appraisals of both properties completed in late 2007 by Vincent D. Quinn. Because of statutory limitations, petitioners were unable to claim the entire charitable contribution deduction for 2007. They accordingly deducted $987,830 on their 2007 return and claimed carryover deductions of $928,318, $872,481, $1,665,366, and $246,006 on their returns for 2008, 2009, 2010, and 2011, respectively.

On June 5, 2012, the IRS timely issued a notice of deficiency for 2007-2010, and on April 4, 2013, the IRS timely issued a notice of deficiency for 2011. These notices disallowed in their entirety the deductions petitioners claimed for donating the easement to the Township and Parcel A to Heritage. The notices also determined accuracy-related penalties. Petitioners timely petitioned this Court for redetermination of these deficiencies and penalties.

We consolidated the two cases for trial, briefing, and opinion. At the outset of trial respondent moved to amend his answer to assert an increased deficiency by disallowing a deduction for petitioners' $268,000 contribution of cash and stock to Heritage. We denied this motion as untimely and prejudicial to petitioners.

**[*13]** D.     <u>Expert Testimony</u>

1.     <u>Vincent D. Quinn</u>

Petitioners offered, and the Court recognized, Vincent D. Quinn as an expert in the valuation of residential real estate. Mr. Quinn, who performed the appraisals that accompanied petitioners' 2007 return, has more than 40 years of experience appraising commercial and residential real estate, including residential subdivisions. Certified as an appraiser by the State of Pennsylvania, he is a member of the Appraisal Institute and holds its MAI designation.

Mr. Quinn has appraised 50 to 100 properties in Bucks County during the last 10 years. He credibly testified that real estate valuations in Bucks County are usually determined on a per-lot basis for properties that have development potential and on a per-acre basis for properties with no development potential. He testified that developers themselves evaluated real estate by determining how many "buildable lots" they could extract from it and get approved. Because a per-acre appraisal would not capture the property's actual development potential, Mr. Quinn testified that a developer would not find it relevant or useful.

Mr. Quinn performed his original appraisal of Parcel A on November 11, 2007, listing its effective date as January 23, 2007, the day before petitioners donated Parcel A to Heritage. He determined that the highest and best use of Parcel

[*14] A was for single-family residential development.  On the basis of a sketch plan prepared by Mr. Glitzer, he determined that this development could comprise nine building lots ranging in size from 1.3 to 3.5 acres.  Employing these assumptions and comparable sales of multi-lot properties, he determined that the fair market value of Parcel A on a per-lot valuation was $2.35 million.

Mr. Quinn performed his original appraisal of the conservation easement on December 5, 2007, listing its effective date as July 10, 2007, the date on which petitioners formally conveyed the easement to the Township.  He determined that the highest and best use of Parcel B before placement of the easement was single-family residential development.  On the basis of another sketch plan prepared by Mr. Glitzer, Mr. Quinn determined that this development could comprise 10 building lots ranging in size from 1.1 to 5.0 acres.  On the basis of comparable sales of multi-lot properties, he concluded that the fair market value of this tract on a per-lot valuation was $3 million.   Subtracting from this figure what he determined to be the value of Parcel B after placement of the conservation easement, he concluded that the easement had a fair market value of $2.35 million.

In August 2015 Mr. Quinn prepared follow-up appraisals of Parcel A and of the easement, again as of January 2007 and June 2007, respectively.  With respect to Parcel A, he made adjustments to his comparable sales that increased the value

[*15] of each lot by about $5,500, yielding an overall value increase of $50,000. With respect to the easement, he made adjustments to his comparable sales that decreased the "after" value of Parcel B by $350,000 and increased the value of the easement to $2.7 million. According to Mr. Quinn's follow-up appraisals, therefore, the aggregate value of petitioners' charitable contributions was $5.1 million ($2.4 million + $2.7 million), as opposed to the $4.7 million reported on their 2007 tax return.

2.    Leonard J. Patcella

Petitioners offered, and the Court recognized, Leonard J. Patcella as an expert in real estate appraisal and the valuation of conservation easements. He has more than 40 years of appraisal experience and has appraised more than 700 properties in Bucks County alone. Certified as an appraiser by the State of Pennsylvania, he is a member of the Appraisal Institute and holds its MAI designation.

Like Mr. Quinn, Mr. Patcella determined that the highest and best use of Parcel A and Parcel B was residential development and relied on Mr. Glitzer's sketch plans to determine the number of buildable lots. Employing a per-lot analysis but adding several comparable sales to the group selected by Mr. Quinn, Mr. Patcella determined that the fair market values of Parcel A and the Parcel B easement, as of the relevant valuation dates, were $2,160,000 and $1,460,600, respec-

**[\*16]** tively. Mr. Patcella separately appraised the buy-back parcel and the easement petitioners received over the Creeks Bend access road. He determined that the fair market value of the buy-back parcel (subject to the conservation easements) was $221,700 and that the fair market value of the driveway easement was no more than $12,000.

### 3. Michael J. Acquaro-Mignogna

Respondent offered, and the Court recognized, Michael J. Acquaro-Mignogna as an expert in real estate appraisal with a specialization in residential subdivisions. Mr. Acquaro-Mignogna has more than 30 years of experience appraising real estate, mostly in Bucks County, although he has not previously performed an appraisal of a conservation easement. Certified as an appraiser by the State of Pennsylvania, he is a member of the Appraisal Institute and holds its MAI and AIGRS designations.

Mr. Acquaro-Mignogna's testimony departed from that of Messrs. Quinn and Patcella in two major respects. First, while agreeing that the highest and best use of Parcel A was residential development, he opined that the highest and best use of Parcel B before placement of the easement was continued use as a single-family "estate property." Second, in determining Parcel A's value for residential development, he used a per-acre analysis based on comparable sales of raw land,

[*17] rather than a per-lot analysis based on comparable sales of multi-lot properties.

Employing these approaches, Mr. Acquaro-Mignogna determined that the fair market value of Parcel A, as of the relevant valuation date, was $920,000. He determined that the fair market value of the Parcel B conservation easement, as of the relevant valuation date, was between $190,000 and $390,000. He was unable to determine a value for the buy-back parcel, and he concluded that the easement petitioners received over the Creeks Bend access road was worth about $29,000.

OPINION

The IRS' determinations in a notice of deficiency are generally presumed correct, though the taxpayer can rebut this presumption. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933). Deductions are a matter of legislative grace, and taxpayers generally bear the burden of proving their entitlement to the deductions claimed. INDOPCO v. Commissioner, 503 U.S. 79, 84 (1992). Petitioners contend that respondent bears the burden of proof for two reasons: (1) they have satisfied the requirements of section 7491(a) for shifting the burden of proof and (2) respondent raised a "new matter" in his answer. See Rule 142(a)(1). Because we decide all factual issues on a preponderance of the evidence, we need not de-

**[\*18]** cide who has the burden of proof. See sec. 7491(a); Estate of Turner v. Commissioner, 138 T.C. 306, 309 (2012).

I.      Charitable Contribution Deductions

Section 170(a)(1) allows a deduction for any charitable contribution made within the taxable year. If the taxpayer makes a charitable contribution of property other than money, the amount of the contribution is generally equal to the fair market value of the property at the time the gift is made. See sec. 1.170A-1(c)(1), Income Tax Regs. A deduction is generally not allowed for a gift of property consisting of less than the donor's entire interest in that property, but there is an exception for (among other things) a "qualified conservation contribution." Sec. 170(f)(3)(A), (B)(iii). This exception applies where: (1) the taxpayer makes a contribution of a "qualified real property interest," (2) the donee is a "qualified organization," and (3) the contribution is "exclusively for conservation purposes." Sec. 170(h)(1). The parties agree that the Parcel B conservation easement petitioners conveyed to the Township satisfies these requirements.

Where the value of contributed property exceeds $5,000, no deduction is allowed unless the taxpayer obtains a "qualified appraisal" of such property. Sec. 170(f)(11)(C). A qualified appraisal is "an appraisal of such property which * * * is conducted by a qualified appraiser in accordance with generally accepted stand-

[*19] ards and any regulations or other guidance prescribed * * * [by the Secretary]. Sec. 170(f)(11)(E)(i)(II). A taxpayer claiming a deduction for a contribution of property whose value exceeds $5,000 must attach to his return a fully completed "appraisal summary." See sec. 1.170A-13(c)(2), Income Tax Regs. The IRS has prescribed Form 8283 to be used as the "appraisal summary." Jorgenson v. Commissioner, T.C. Memo. 2000-38, 79 T.C.M. (CCH) 1444, 1450. Where (as here) a contribution of property is valued in excess of $500,000, the taxpayer must attach to his return not only an appraisal summary but also a copy of the appraisal itself. Sec. 170(f)(11)(D).

Respondent contends that petitioners' charitable contribution deductions should be denied in their entirety on the theory that they lacked donative intent and/or failed to satisfy statutory and regulatory reporting requirements. If we reject these threshold arguments, respondent contends that petitioners' deductions should be reduced substantially on the theory that they overvalued the donated property and/or received a return benefit that partially offsets the value of their gifts. We consider these arguments in turn.

**[*20]** A.    Donative Intent

"The sine qua non of a charitable contribution is a transfer of money or property without adequate consideration." United States v. Am. Bar Endowment, 477 U.S. 105, 118 (1986).  If a transaction with a charity "is structured as a quid pro quo exchange"--i.e., if the taxpayer receives from the charity property or services equal in value to what he conveyed--there is no "contribution or gift" within the meaning of the statute.  Hernandez v. Commissioner, 490 U.S. 680, 701-702 (1989).

In assessing whether a transaction constitutes a "quid pro quo exchange," we give most weight to the external features of the transaction, avoiding imprecise inquiries into taxpayers' subjective motivations.  See Hernandez, 490 U.S. at 690-691; Christiansen v. Commissioner, 843 F.2d 418, 420 (10th Cir. 1988).  "If it is understood that the property will not pass to the charitable recipient unless the taxpayer receives a specific benefit, and if the taxpayer cannot garner that benefit unless he makes the required 'contribution,' the transfer does not qualify the taxpayer for a deduction under section 170."  Costello v. Commissioner, T.C. Memo. 2015-87, at *27; see Christiansen, 843 F.2d at 420-421; Graham v. Commissioner, 822 F.2d 844, 849 (9th Cir. 1987), aff'g 83 T.C. 575 (1984), aff'd sub nom. Hernandez v. Commissioner, 490 U.S. 680.

[*21] The external features of the transactions at issue show that petitioners' gifts were not part of a "quid pro quo exchange." Petitioners conveyed a fee simple interest in Parcel A to Heritage on January 24, 2007. This was an outright gift that petitioners could not claw back. Their conveyance of Parcel A was not conditioned on Heritage's provision of any return benefit, and Heritage in fact supplied petitioners with no return benefit.

The same is true of petitioners' conveyance to the Township, on July 10, 2007, of a conservation easement over Parcel B. Petitioners retained the right to make improvements to their 2-acre residential envelope; their gift took the form of an easement over the remaining 23 acres. That gift was made with no strings attached. The grant of the easement was not conditioned on the Township's provision of any return benefit, nor was it made in the expectation that the Township would supply a return benefit.

In urging that there was a "quid pro quo exchange," respondent focuses chiefly, not on any specific benefit petitioners received, but on their supposed ability to steer the entire set of transactions in a way that benefited them. In respondent's view, petitioners were motivated by a desire to protect their privacy and to prevent suburban development from spoiling the attractive views from their residence. Noting that petitioners were involved in the negotiations from the outset,

[*22] respondent surmises that the Township and Heritage, if not ceding petitioners actual control, allowed them to guide the transactions in a direction that achieved their personal goals.

In support of this characterization, respondent notes that the final conservation subdivision plan grew out of the March 2006 sketch by Mr. Glitzer, whom petitioners had hired. Under that plan, most of the residences in the Creeks Bend subdivision were south of the access road, at a considerable distance from petitioners' homestead. And by acquiring the buy-back parcel for what respondent regards as the bargain price of $485,000, petitioners secured a 37-acre "cushion" of pristine land that separated their homestead property from the Creeks Bend subdivision on all three sides.

We are unpersuaded by respondent's characterization of these events. Petitioners were indeed involved in the negotiations from the outset, but this was inevitable: They owned Parcel A and Parcel B, they held an option to acquire the Rorer Tract, and it was obvious that any successful conservation plan would require a substantial economic contribution from them. They negotiated for 18

[*23] months with the Rorers, the Township, Heritage, and Mr. Zaveta to determine the economic contributions that each party would be required to make.[2]

There is no evidence that petitioners had the power to manipulate these negotiations or that the other parties made meaningful concessions to them. The Township and Heritage were single-mindedly dedicated to accomplishing the maximum degree of environmental conservation consistent with the financial realities they confronted. The Township's representative credibly testified that petitioners asked for nothing in exchange for their contribution and that they held no sway over the conservation subdivision planning.

Mr. Zaveta was committed to achieving an environmentally sensitive subdivision plan that would yield him the greatest economic profit. He credibly testified that he never discussed lot placement with petitioners and that his focus was maximizing the market value of the new subdivision. He explained that the lots in the Creeks Bend subdivision were sited mostly to the south of the access road for

---

[2]Respondent notes that the various conservation transactions were interrelated and dependent on one another. That is correct, but it does not mean that petitioners received a quid pro quo. Petitioners donated Parcel A to Heritage; they donated an easement over Parcel B to the Township; they contributed $268,000 to Heritage to cover its transaction costs; and they supplied $485,000 of cash in exchange for the (relatively worthless) buy-back parcel. Had petitioners not actively participated in the negotiations, it is possible that even more might have been required of them. Being relieved of an obligation to provide more does not constitute a quid pro quo negating the value of what one has provided.

**[\*24]** two reasons:  (1) there was not enough room to put them on the north side, given the proximity of petitioners' southern boundary line; and (2) if sited to the north, several houses would have looked out on petitioners' former airplane hanger, which was not a desirable view.  With more-than-ample acreage available below the access road, it was not in Mr. Zaveta's economic interest to have his multi-million-dollar homes situated cheek-by-jowl with petitioners' property.

Respondent insists that the buy-back parcel was very valuable to petitioners because it protected them on all sides from residential development.  But petitioners were already protected from residential development by the conservation subdivision plan, which barred additional homes within Creeks Bend, and by the prior placement of conservation easements over the buy-back parcel.  Petitioners did not need to purchase the buy-back parcel in order to get this protection; they already had it.  Petitioners purchased the buy-back parcel for $485,000 in order to supply the cash needed to close the deal; far from garnering a quid pro quo thereby, they likely paid more for this acreage than it was worth.  See infra pp. 48-49.

In deciding whether petitioners had the requisite donative intent, we look to the external features of the transaction to ascertain whether they expected to receive a quid pro quo that canceled out their charitable gifts.  We do not find the expectation of any such quid pro quo.  Whenever a homeowner places a conserva-

[*25] tion easement over his property, or a neighbor places a conservation easement over neighboring property, the homeowner in a sense "benefits" by having natural landscapes rather than suburban sprawl in his immediate surroundings. When the Township approved a conservation subdivision on the Rorer Tract, petitioners may be said to have "benefited" because the Rorer Tract surrounded their property. But petitioners were mere incidental beneficiaries of this action. Heritage and the Township executed these transactions not to benefit petitioners or the Creeks Bend homeowners but to accomplish their charitable purposes of conserving rural and agricultural land. See McLennan v. United States, 24 Cl. Ct. 102, 107 (1991) (upholding charitable contribution deduction where "[a]ny benefit which inured to * * * [the taxpayer] from the conveyance was merely incidental to an important, public spirited, charitable purpose"), aff'd, 994 F.2d 839 (Fed. Cir. 1993).

B. Reporting and Substantiation Requirements

For contributions of $250 or more, a taxpayer must obtain a "contemporaneous written acknowledgment" (CWA) from the donee. See sec. 170(f)(8)(A). A CWA must include (among other things) whether the donee organization furnished any goods or services in exchange for the gift and (if so) a description and good-faith estimate of the value of such goods or services. For contributions of

**[\*26]** property whose value exceeds $5,000, the taxpayer must attach to his return a fully completed appraisal summary on Form 8283. Sec. 1.170A-13(c)(2)(i)(B), Income Tax Regs. The appraisal summary must be signed and dated by the donee and must set forth specified information, including "a statement explaining * * * the amount of any consideration received from the donee for the contribution." Id. subpara. (4)(ii)(H). An important goal of the appraisal summary is to "foster disclosure of 'dual payment' or quid pro quo contributions." Boone Operations Co. v. Commissioner, T.C. Memo. 2013-101, at \*7 (quoting Viralam v. Commissioner, 136 T.C. 151, 171 (2011)).

The Township and Heritage supplied petitioners with timely CWAs for the contributions in question. And petitioners attached to their 2007 tax return Forms 8283 properly executed by both organizations and by Mr. Quinn as appraiser. Respondent contends that all of these documents were deficient because they failed to disclose and value quid pro quos that petitioners allegedly received.

We find no merit in this argument. As explained previously, petitioners received no quid pro quo in terms of ability to manipulate the overall conservation transactions to their benefit. See supra pp. 21-24. As we discuss below, petitioners did receive one (rather small) return benefit when the dust settled, namely, a recorded easement over the Creeks Bend access road, which provided rear access

**[\*27]** to their homestead property. See infra pp. 50-52. But there is no evidence that the Township or Heritage was aware of this easement arrangement when it executed the CWA, or that Mr. Quinn was aware of it when he performed his appraisals and executed the Forms 8283. And petitioners understandably regarded this easement as having no material value because it simply continued the informal easement they previously enjoyed over the Rorer Tract. We find that the CWAs and Forms 8283 complied with all statutory and regulatory requirements and that petitioners reasonably relied on all four documents.

## C. Valuation

Petitioners contend that the fair market value of their donation to Heritage of a fee simple interest in Parcel A was at least $2.35 million, and that the fair market value of their donation to the Township of a conservation easement over Parcel B was likewise at least $2.35 million. Respondent contends that the value of Parcel A was $920,000 and that the value of the conservation easement was between $190,000 and $390,000. We conclude that the appropriate values lie in between these poles.

### 1. General Principles

The fair market value of property is the price at which it would change hands between a willing buyer and a willing seller, neither being under any com-

[*28] pulsion to buy or sell and both having reasonable knowledge of the relevant facts. See sec. 1.170A-1(c)(2), Income Tax Regs. The willing buyer and the willing seller are hypothetical persons, rather than specific individuals or entities. See Estate of Bright v. United States, 658 F.2d 999, 1005-1006 (5th Cir.1981); Estate of Newhouse v. Commissioner, 94 T.C. 193, 218 (1990). Fair market value is a question of fact and is measured on the applicable valuation date. See sec. 170(a); Chapman Glen Ltd. v. Commissioner, 140 T.C. 294, 324 (2013); sec. 1.170A-1(c)(1), Income Tax Regs. In determining fair market value, the trier of fact must draw appropriate inferences from all relevant evidence of value. See Commissioner v. Scottish Am. Inv. Co., 323 U.S. 119, 123-125 (1944); Helvering v. Nat'l Grocery Co., 304 U.S. 282, 294 (1938).

Fair market value reflects the highest and best use of the property on the valuation date. See Mitchell v. United States, 267 U.S. 341, 344-345 (1925); United States v. Meadow Brook Club, 259 F.2d 41, 45 (2d Cir.1958); Symington v. Commissioner, 87 T.C. 892, 896 (1986); Stanley Works & Subs. v. Commissioner, 87 T.C. 389, 400 (1986). We have defined "highest and best use" as "[t]he reasonably probable and legal use of vacant land or an improved property that is physically possible, appropriately supported, and financially feasible and that results in the highest value." Whitehouse Hotel Ltd. P'ship v. Commissioner, 139

**[\*29]** T.C. 304, 331 (2012) (quoting Appraisal Institute, The Appraisal of Real Estate 277 (13th ed. 2008)), aff'd in part, vacated in part, and remanded on other grounds, 755 F.3d 236 (5th Cir. 2014).

We typically consider one or more of three approaches to determine fair market value: (1) the market approach, (2) the income approach, and (3) the asset-based approach. Bank One Corp. v. Commissioner, 120 T.C. 174, 306 (2003), aff'd in part, vacated in part, and remanded on another issue sub nom. J.P. Morgan Chase & Co. v. Commissioner, 458 F.3d 564 (7th Cir. 2006). Determining which method to apply presents a question of law. See Chapman Glen Ltd., 140 T.C. at 325-326. Here, all three expert witnesses agreed that the market approach supplies the appropriate methodology, and we concur in that assessment.

The market approach--sometimes called the "sales comparison" approach--is normally used to value residential property. It values the subject property by reference to the prices paid for similar properties that were sold near the valuation date. See Estate of Spruill v. Commissioner. 88 T.C. 1197, 1229 n.24 (1987); Wolfsend Land & Cattle Co. v. Commissioner, 72 T.C. 1, 19 (1979). Because two pieces of real estate are rarely identical, the prices of the comparable properties are adjusted to create parity between those properties and the subject property. The reliability of the market method depends upon the comparability of the properties

**[*30]** selected and the reasonableness of the adjustments made to their prices. Wolfsend Land & Cattle Co., 72 T.C. at 19-20.

An expert witness' opinion is admissible if it assists the trier of fact to understand the evidence or to determine a fact in issue. Fed. R. Evid. 702. We evaluate expert opinions in light of the expert's qualifications and the evidence in the record. See Parker v. Commissioner, 86 T.C. 547, 561 (1986). When experts offer differing estimates of fair market value, we weigh those estimates by examining (among other things) the factors they considered in reaching their conclusions. See Casey v. Commissioner, 38 T.C. 357, 381 (1962). We are not bound by a particular expert's opinion and may accept or reject it in whole or in part. See Helvering v. Nat'l Grocery Co., 304 U.S. at 295; Parker, 86 T.C. at 561-562. We may also determine a fair market value based on our own examination of the evidence in the record. See Silverman v. Commissioner, 538 F.2d 927, 933 (2d Cir. 1976), aff'g T.C. Memo. 1974-285.

2.      Fee Simple Interest in Parcel A

The parties agree that the fair market value of Parcel A must be determined according to its highest and best use and that the highest and best use of Parcel A in January 2007 was residential development. The parties disagree chiefly on two points: (1) whether "comparable sales" are sales of raw land at a per-acre price or

[*31] sales of multi-lot properties at a per-lot price and (2) if we adopt the latter approach, what downward adjustment should be applied to the comparable sale prices to account for the fact that Parcel A had no development approvals in place.

Mr. Quinn based his appraisal on Mr. Glitzer's November 2006 sketch plan, which showed a nine-lot development on Parcel A. Because Parcel A was zoned CR-1, it theoretically could accommodate up to 20 residences on one-acre lots. However, given the Township's conservation priorities and the existence of a creek on the parcel's north side, Mr. Glitzer believed that a nine-lot development was the densest proposal likely to receive approval.

Adopting this premise, Mr. Quinn selected as his comparable properties multi-lot properties intended for residential development. Two of these properties were in the Township and three were elsewhere in Bucks County. Before adjustments, the sale prices were as follows:

| Property | Date | Price | # Lots | Price per lot |
|----------|------|-------|--------|---------------|
| Creeks Bend | 7/07 | $5.18 million | 10 | $517,500 |
| Rockbridge | 5/06 | 0.85 million | 3 | 283,333 |
| Broad Street | 8/05 | 1.34 million | 6 | 223,499 |
| Brookshire | 6/05 | 7.25 million | 29 | 250,000 |
| Rapuano Farm | 6/04 | 6.01 million | 20 | 300,500 |

**[\*32]** Unlike Parcel A, each of these multi-lot properties was sold with development approvals already in place. Among the adjustments Mr. Quinn needed to make to his comparable prices, therefore, was a downward adjustment to account for the expense and uncertainty of getting Township approval for a nine-lot residential development on Parcel A. He made a 10% adjustment for this purpose. He concluded that a larger adjustment was unnecessary because: (1) Mr. Glitzer's sketch plan was conservative and incorporated much of the planning necessary to secure approval and (2) Mr. Glitzer's firm served as the Township's engineers and would able to use this experience to expedite the approval process.

After making other adjustments to the comparable properties' prices, Mr. Quinn determined a per-lot value ranging between $240,625 and $362,854. He concluded that Parcel A's value should fall near the middle of this range at $288,888 per lot. He accordingly determined that Parcel A's total value at the time of donation was $2,600,000 ($288,888 × 9 lots).

Mr. Quinn then performed an "enhancement" analysis that he thought was required by section 1.170A-14(h)(3), Income Tax Regs. The purpose of this analysis was to determine a downward adjustment to Parcel A's value to account for the expected placement by Heritage of a conservation easement upon it, which would benefit petitioners' adjacent homestead property. After consulting market

[*33] data, Mr. Quinn estimated that Heritage's placement of a conservation easement over Parcel A would enhance the value of Parcel B by $200,000. Subtracting that sum from $2,600,000, he determined in his expert report a final donation value for Parcel A of $2,400,000. This figure was $50,000 higher than his original 2007 appraisal because of refinements to his comparable sale prices.

Petitioners' second expert, Mr. Patcella, agreed with Mr. Quinn in employing a per-lot analysis. He selected as his comparable sales three of Mr. Quinn's sales and three other sales of multi-lot properties. One of his properties was in the Township and five were elsewhere in Bucks County, as follows:

| Property | Date | Price | # Lots | Price per lot |
|----------|------|-------|--------|---------------|
| Highland Road | 6/04 | $5.46 million | 20 | $273,000 |
| Durham Road | 2/04 | 2.76 million | 25 | 110,380 |
| Matthews Ridge | 4/06 | 2.90 million | 16 | 181,250 |
| Chapman Corner | 7/06 | 3.69 million | 22 | 167,509 |
| Broad Street | 8/05 | 1.34 million | 6 | 223,499 |
| Brookshire | 6/05 | 7.25 million | 29 | 250,000 |

Mr. Patcella's comparable properties had development approvals in place or were sold contingent on the buyer's receiving approval for the desired number of lots. While sharing Mr. Quinn's view that the Township would likely approve a nine-lot development on Parcel A fairly quickly, Mr. Patcella determined that Mr. Quinn's 10% downward adjustment was too small and concluded that an adjust-

[*34] ment of 15% to 20% would be more appropriate. After making other adjustments that he believed appropriate, he determined an average value of $240,000 per lot for the comparable properties, yielding a total value of $2,160,000 ($240,000 × 9 lots) for Parcel A as of the valuation date.

Respondent's expert, Mr. Acquaro-Mignogna, testified that a per-lot valuation would be too speculative because it was uncertain how many lots the Township would actually approve for development on Parcel A. He accordingly selected sales of raw land as his comparables and used the per-acre sale prices of these properties as his index of Parcel A's value. He selected the following sales as comparables:

| Property | Date | Price | # Acres | Price per acre |
|----------|------|-------|---------|----------------|
| New Hope Road | 3/06 | $0.51 million | 16.35 | $31,254 |
| Lower York Road | 9/05 | 5.45 million | 106.00 | 51,415 |
| Lower York Road 2 | 5/05 | 4.55 million | 106.00 | 42,925 |
| Ridgeview Drive | 8/05 | 2.15 million | 47.07 | 45,677 |
| Old York Road | 3/05 | 1.00 million | 30.42 | 32,873 |

Whereas Parcel A was zoned CR-1 (single-family residences on one-acre lots), three of Mr. Acquaro-Mignogna's comparable properties were zoned for agricultural use only, and the other two were zoned for mixed agricultural and residential use. None of his comparables was in the Township although all were in Bucks County. After adjusting the comparable sale prices he determined an

**[*35]** average sale price of $46,000 per acre; he accordingly valued Parcel A at $920,000 ($46,000 × 20 acres). If sales of multi-lot approved properties were to be used as comparables, as Messrs. Quinn and Patcella believed appropriate, Mr. Acquaro-Mignogna expressed the view that a downward price adjustment of 50% to 75% would be necessary to render those properties comparable to Parcel A.

We agree with the per-lot approach employed by petitioners' experts. Since Parcel A's highest and best use was residential development, the most likely buyer of Parcel A would be a residential developer. Mr. Zaveta was an experienced residential developer, and he credibly testified that residential developers in Bucks County formulate their land offers by reference to the number of buildable lots that the acreage is expected to yield. If that is how prospective buyers of Parcel A would formulate their offers, that would seem the most logical route to determining Parcel A's fair market value.

We are unpersuaded by respondent's submission that this per-lot approach is too speculative. While no one could know for sure whether the Township would approve a nine-lot development on Parcel A, Mr. Glitzer had considerable experience in these matters and credibly testified that such approval was likely. Messrs. Quinn and Patcella, likewise experienced in the ways of Bucks County, seconded that opinion.

**[*36]** The evidence established that a developer contemplating purchase of unimproved land in Bucks County would either make a full-price offer contingent on development approval's being secured or make his best estimate as to the likelihood of getting the desired approval and discount his offer accordingly. In either event, the developer would formulate his offer on a per-lot, not on a per-acre, basis. The possibility that the expected number of buildable lots might not be approved is adequately accounted for by making an appropriate downward adjustment to the sale prices of the comparable properties.

We agree with respondent, however, that the 10% downward adjustment made by Mr. Quinn and the 15% to 20% downward adjustment favored by Mr. Patcella are too small. Mr. Zaveta testified that Bucks County is not "developer-friendly" and that obtaining development approval can be a "long and arduous process." He noted that the approval process could take three years to complete; even if ultimate approval was likely, the developer might incur carrying charges and other costs for an extended period.

On the other hand, we are unpersuaded by Mr. Acquaro-Mignona's view that an adjustment in the range of 50% to 75% is necessary. He provided no concrete data to support this estimate, and an adjustment this large is at odds with the consensus of the other witnesses that a nine-lot development on Parcel A would

[*37] likely be approved fairly quickly.  Evaluating the witnesses' testimony and the record as a whole, we find that a downward adjustment of 25% to the prices of the comparable properties selected by petitioners' experts is appropriate to account for the fact that Parcel A had no development approvals in place.[3]

We may briefly dispose of the remaining points in dispute.

• Respondent argues that one of Mr. Quinn's comparable sales--Heritage's sale to Mr. Zaveta of the 10 lots that would become the Creeks Bend subdivision--should be eliminated because it occurred after January 24, 2007, the date on which petitioners conveyed Parcel A to Heritage.  Mr. Patcella believed that this sale did not furnish a useful comparison because its final pricing was "affected by too many non-market variables," including the conservation easements.  We agree with respondent and Mr. Patcella and will eliminate the Creeks Bend transaction from Mr. Quinn's set of comparable sales.

• Mr. Quinn's fifth comparable, Rapuano Farm, sold for $6,900,000 with two of its 21 lots already improved with homesteads.  Mr. Quinn correctly sub-

---

[3]While do not agree with any of the expert witnesses' adjustment rates, we note that all three considered the physical characteristics of the comparable properties in determining Parcel A's relative development potential.  Mr. Quinn adjusted his prices for zoning, density, and approvals.  Mr. Patcella adjusted his prices for site characteristics.  Mr. Acquaro-Mignogna adjusted his prices for topography, site improvements, and zoning.

[*38] tracted from the recorded sale price the value of one homestead ($890,000), but he neglected to subtract the value of the other homestead ($550,000). Making that subtraction, we find that the comparable sale price for Rapuano Farm should be $5,460,000, yielding an unadjusted per-lot price of $287,368 ($5,460,000 ÷ 19 lots) rather than $300,500.

  • Mr. Quinn noted that a nine-lot residential development would require construction of a new bridge over the creek at the north end of Parcel A. Mr. Patcella agreed, but he opined that this negative was offset by the attractive entrance this setting would provide. Mr. Acquaro-Mignona opined that the cost of building a new bridge would be $302,000. Considering all the testimony, we conclude that the cost of constructing a new entrance bridge would be an infrastructure cost borne by the developer and does not require a downward adjustment to Parcel A's fair market value.

  • Mr. Quinn made a $200,000 downward adjustment for "enhancement" to the value of petitioners' homestead on Parcel B. Section 1.170A-14(h)(3), Income Tax Regs., provides that "[i]f the granting of a perpetual conservation restriction * * * has the effect of increasing the value of any other property owned by the donor," the charitable contribution deduction allowed for the conservation easement shall be reduced accordingly. Against his own interest, respondent

[*39] contends (consistently with his expert's view) that this regulation does not apply to Parcel A, and we agree.  Petitioners donated to Heritage a fee simple interest in Parcel A, not a conservation easement.  The regulation by its terms does not apply to this transaction, so there is no basis for Mr. Quinn's $200,000 downward adjustment.

To summarize:  Although Mr. Patcella used some of the same comparables as Mr. Quinn, we are unable to determine how Mr. Patcella in his expert report made the downward adjustment for Parcel A's lack of development approval.  We will accordingly use Mr. Quinn's report to determine the fair market value of Parcel A.  If we eliminate the Creeks Bend sale from Mr. Quinn's set of comparables, reduce to $287,368 the unadjusted per-lot price of Rapuano Farm, raise to 25% the downward adjustment for Parcel A's lack of development approval, and run these revised numbers through Mr. Quinn's matrix, we get a revised per-lot price of $243,544 for the comparable properties.  No further downward adjustment is required for "enhancement" to petitioners' homestead property.  We thus find the fair market value of Parcel A to be $2,191,896 ($243,544 × 9 lots).

### 3. Conservation Easement Over Parcel B

We turn now to the valuation of the conservation easement that petitioners donated to the Township on July 10, 2007.  Section 1.170A-14(h)(3)(i), Income

**[\*40]** Tax Regs., requires us to determine "the fair market value of the perpetual conservation restriction at the time of the contribution." The regulation elaborates on this requirement as follows:

> If there is a substantial record of sales of easements comparable to the donated easement * * *, the fair market value of the donated easement is based on the sales prices of such comparable easements. If no substantial record of market-place sales is available to use as a meaningful or valid comparison, as a general rule (but not necessarily in all cases) the fair market value of a perpetual conservation restriction is equal to the difference between the fair market value of the property it encumbers before the granting of the restriction and the fair market value of the encumbered property after the granting of the restriction.

Because a market for the purchase and sale of conservation easements rarely exists, the value of a conservation easement is ordinarily determined using the "before and after" approach mentioned in the regulation. Symington v. Commissioner, 87 T.C. at 895; Hilborn v. Commissioner, 85 T.C. 677, 688-689 (1985). We will employ that approach here.

a.    "Before" Value

Section 1.170A-14(h)(3)(ii), Income Tax Regs., provides the following guidance in determining the "before" value:

> [T]he fair market value of the property before contribution of the conservation restriction must take into account not only the current use of the property but also an objective assessment of how immediate or remote the likelihood is that the property, absent the restriction, would in fact be developed, as well as any effect from zoning,

[*41] conservation, or historic preservation laws that already restrict the property's potential highest and best use.

The parties agree that the "before" value of Parcel B depends on its highest and best use, but they disagree as to what that highest and best use was. Petitioners contend that the highest and best use of Parcel B prior to placement of the easement was residential development, and their experts determined its fair market value using essentially the same market approach that they used for Parcel A. Respondent contends that the highest and best use of Parcel B before placement of the easement was continued use as a single-home "estate property."

On this threshold point we agree with petitioners. Parcel B is next to Parcel A. The two parcels are comparable in size (25 vs. 20 acres) and have roughly similar topography. They share a northern frontage on Washington Crossing Road and a long border running from north to south. In material respects these two parcels are fungible, except for the presence of a pre-existing residential compound on Parcel B. If the highest and best use of Parcel A is residential development, as respondent concedes, common sense suggests that residential development is also the highest and best use of Parcel B.

In opining to the contrary, Mr. Acquaro-Mignona started with the premise that Parcel B with its existing improvements was worth $2.75 million. He sur-

[*42] mised that owners of estate properties like this would insist on substantial acreage around their residence to protect their privacy. If petitioners' residential envelope were reduced to two acres, as proposed in Mr. Glitzer's 10-lot sketch plan, Mr. Acquaro-Mignona believed that the value of the residential compound would be reduced to $1.3 million. He further opined that the remaining 23 acres, lacking development approvals, would be worth no more than $50,000 an acre to a developer, or $1.15 million all told. Because the loss in value to the residential compound occasioned by development ($1.45 million) supposedly exceeded the price that a developer would pay for the other 23 acres ($1.15 million), Mr. Acquaro-Mignona opined that residential development would make no economic sense. He accordingly concluded that Parcel B's highest and best use was "continued use and maintenance of the existing improvements as a single tract."

We are not persuaded by this line of reasoning. Parcel B, adjacent to Parcel A and the Rorer Tract, is in an extremely desirable part of Bucks County. The suitability of this land for residential development is shown by the fact that numerous developers made very large offers to purchase the Rorer Tract. If residential development represents the highest and best use of all the land surrounding Parcel B, it is hard to see why its highest and best use should be differ-

**[*43]** ent. Farmland does not cease to be suitable for residential development because it has a farmhouse on it.

The linchpin for Mr. Acquaro-Mignona's contrary conclusion is his assumption that a developer would pay no more than $50,000 per acre for the 23 acres surrounding the residential compound. The record does not support this assumption. In order to exercise their option to purchase the adjacent Rorer Tract, petitioners would have been required to pay $13.4 million. Since the Rorer Tract comprised 137 acres, that translates to roughly $100,000 per acre, or double the price Mr. Acquaro-Mignona assumed. As discussed previously, moreover, developers in Bucks County formulate their offers in terms of a per-lot price, and comparable properties were selling for well in excess of $200,000 per lot. Since Parcel B could accommodate nine lots in addition to the residential compound, it is obvious that a developer would pay substantially more than $1.15 million for the surrounding 23 acres.

For these reasons, we agree with petitioners' experts that the highest and best use of Parcel B before imposition of the easement was residential development. To determine this "before" value, Mr. Quinn and Mr. Patcella both employed the sales-comparison approach, using the same comparable sales they had used to value Parcel A. Relying on Mr. Glitzer's sketch plans, they assumed that

[*44] Parcel B would be approved for a 10-lot development; nine of these lots would be new residences and the tenth would be petitioners' existing homestead.

Because we found internal inconsistencies in Mr. Quinn's treatment of the residential compound,[4] we will base our determination of Parcel B's "before" value on Mr. Patcella's approach. He concluded, as he had concluded for Parcel A, that each buildable lot was worth $240,000. As discussed above, we conclude that the appropriate per-lot value derived from comparable sales is $243,544; the fair market value of the nine lots is thus $2,191,896. Mr. Patcella determined the value of the tenth lot, comprising petitioners' homestead, by reference to sales of comparable homes in Bucks County residential subdivisions. He determined this value to be $900,000, which we find reasonable. We accordingly conclude that the "before" value of Parcel B was $3,091,896 ($2,191,896 + $900,000).

b.    "After" Value

Following imposition of the conservation easement over Parcel B, petition-ers owned a 25-acre tract that included a two-acre residential compound, to which they were free to make further improvements, and 23 surrounding acres, which

---

[4]Mr. Quinn assumed for purposes of his valuation that all 10 lots on Parcel B were vacant as of the valuation date. He adjusted the prices of the comparable sales by subtracting the value of any improvements situated therein. This created a hypothetical condition that Parcel B and all of the comparable properties were vacant land suitable for residential development.

**[*45]** were fully conserved and ineligible for any development. We must decide the fair market value of this property.

Mr. Quinn determined that the "before" value of Parcel B was $3.0 million and that imposition of the easement diminished its value by $2.7 million. He thus accorded the 25-acre homestead property an "after" value that could not exceed $300,000. Although we do not fully understand the methodology he used to reach this result, the result is clearly incorrect. Mr. Zaveta paid $517,500 per lot for raw land in the Rorer Tract. Petitioners' homestead property was improved with a large residence dating to the 17th century, a cottage, a guest house, garages, and a large barn, all of which were surrounded by 23 acres of pristine land. It is obvious that Parcel B, after placement of the conservation easement, was worth substantially more than $300,000.

Mr. Patcella determined Parcel B's "after" value by considering sales of similar homesteads on large lots that were subject to conservation easements or otherwise unsuitable for development (e.g., because of poor location or terrain conditions). He selected five comparable properties in Bucks County, ranging from 24 acres to 62 acres, each improved with an original stone house and outbuildings. The sale prices for these properties ranged from $1.59 million to $2.45 million; the property within the Township sold for $1.65 million. On the basis of

**[\*46]** these comparable sales, he determined that the "after" value of Parcel B was $1.6 million.  We find Mr. Patcella's approach reasonable and find $1.6 million to be the value of Parcel B following imposition of the easement.

Mr. Acquaro-Mignogna did not perform a distinct "after" valuation of Parcel B.  Rather, he valued Parcel B and the buy-back parcel together as a 62-acre tract.  This was necessary, he believed, to comply with the "contiguous parcel" rule set forth in the regulations.  See sec. 1.170A-14(h)(3)(i), Income Tax Regs.  Applying this rule, Mr. Acquaro-Mignogna determined that the 62-acre parcel had a "before" value ranging from $3.3 to $3.5 million and an "after" value of $3.11 million.

We reject this approach because the contiguous parcel rule has no application here.  By its terms, this rule applies only where a "perpetual conservation restriction * * * cover[s] a portion of the contiguous property owned by a donor."  Id. subdiv. (i) (fourth sentence) (emphasis added).  When petitioners acquired the buy-back parcel, both it and Parcel B were fully covered by conservation easements.  Perpetual conservation restrictions thus covered not a portion but the entirety of the contiguous property that they owned.  The rule respondent cites has no sensible application when easements cover the entire contiguous property,

**[*47]** since no portion of that property will then receive any incremental benefit from being adjacent to conserved land.

To summarize:  We find the "before" value of Parcel B to be $3,091,896, using Mr. Patcella's methodology but substituting for his comparable per-lot price the $243,544 value we determined previously.  We find the "after" value of Parcel B to be $1,600,000, using Mr. Patcella's comparable-sales analysis.  We thus find that the fair market value of the conservation easement over Parcel B was $1,491,896 ($3,091,896 – $1,600,000).

D.    Return Benefits

Respondent advances a variety of arguments in contending that petitioners received quid pro quos that negated their charitable contributions in whole or part. We have already rejected respondent's contentions that Heritage and/or the Township supplied petitioners with a quid pro quo by allowing them to manipulate the overall conservation transactions to their benefit.  See supra pp. 21-24.  Alternatively, respondent cites specific components of the transactions in contending that petitioners received return benefits that offset their contributions in part.  Three of respondent's points merit brief discussion.

First, respondent contends that petitioners enjoyed a quid pro quo when Heritage sold them the buy-back parcel for $485,000.  The uniform testimony at

**[*48]** trial was that the parties were $485,000 short of the sum needed to close the deal; that no one needed the buy-back parcel, which was completely covered by conservation easements; and that petitioners agreed to pay $485,000 for this tract in order to get to the finish line. In deciding whether this transaction generated a quid pro quo, the question is whether the buy-back parcel was worth more than petitioners paid for it.

We conclude that it was not. Mr. Patcella was the only expert who performed a stand-alone appraisal of the buy-back parcel. He credibly testified that this parcel had very little value because the conservation easements prevented any further development of it. He accordingly valued the buy-back parcel on a per-acre basis, which Mr. Quinn agreed was appropriate when valuing Bucks County land with no development potential.

Mr. Patcella selected as comparable properties seven large parcels in Bucks County, ranging from 44 acres to 95 acres. After adjusting the sale prices to remove the value of any improvements, thus rendering these tracts comparable to the buy-back parcel, he determined per-acre prices ranging from $1,586 to $13,021. Noting that the average of the sale prices was $5,557 an acre, he concluded that the buy-back parcel fully subject to easement was worth roughly $222,000 ($6,000 × 37 acres). Even taking the highest of the seven comparable sale prices, or

**[\*49]** $13,021 per acre, would yield a total value of $481,777, which is less than the $485,000 that petitioners paid. We conclude that petitioners derived no quid pro quo from this transaction because they likely paid more for the buy-back parcel than it was worth.[5]

Second, respondent contends that petitioners received a return benefit when Heritage paid $7,950 of real estate transfer taxes associated with its sale of the buy-back parcel to petitioners. Petitioners contend that, under local law, Heritage as the seller was responsible for the transfer taxes, notwithstanding its tax-exempt status. We agree with petitioners and conclude that they received no return benefit on this account. See 72 Pa. Stat. and Cons. Stat. Ann. sec. 8102-C (West 2015) ("Every person who makes, executes, delivers, accepts or presents for recording any document or in whose behalf any document is made, executed, delivered, accepted or presented, shall be subject to pay for and in respect to the transaction

---

[5]Respondent suggests that this transaction is suspect because petitioners thereby repurchased from Heritage substantial acreage that they had donated to Heritage only six months previously. But the parties could have accomplished the same end result if petitioners had partitioned Parcel A, donated to Heritage the portion of Parcel A required for the conservation subdivision, and placed an easement over the balance of Parcel A. The township's representative credibly testified that the parties rejected this route in favor of the route actually implemented because getting approval to partition Parcel A would have been time consuming and expensive if petitioners instead of Heritage had applied to do this.

**[\*50]** or any part thereof \* \* \* a State tax at the rate of one per cent of the value of the real estate[.]").

Finally, respondent contends that petitioners received a tangible benefit by obtaining, for no consideration, a recorded easement affording them secondary access to their homestead over the new Creeks Bend private road. Petitioners urge that this easement conferred no material benefit on them. Because the Rorers had allowed them to use the prior gravel road without payment, they contend that the easement merely perpetuated a benefit they already enjoyed.

Members of the Creeks Bend homeowners association were required to pay fees to maintain the private road year round, and petitioners were exempt from these fees. This road was extended to petitioners' southern boundary line for their convenience. Although the Rorers had allowed petitioners to use the old gravel road for free, that informal easement was unrecorded and gave petitioners no rights vis-a-vis the new owners. Because petitioners received over the new private road a recorded easement that arose from the final conservation subdivision plan, we conclude that it constituted a return benefit that must be valued.[6]

---

[6]It is not entirely clear who, as between Heritage and Mr. Zaveta, should be regarded as having provided this benefit to petitioners. Since this benefit arose as a component of the overall conservation transaction, we think it should operate to reduce petitioners' charitable contribution. Alternatively, if this benefit were

(continued...)

[*51] Mr. Patcella did not directly value this easement.  Instead, he determined the cost of improving and upgrading the main driveway leading to petitioners' homestead from the north.  He did this by estimating the cost of building guardrails and installing lighting to make the driveway less hazardous if an accident were to occur.  He estimated those costs to be no more than $12,000.

Mr. Acquaro-Mignogna used a cost-based method to value the easement.  He ascertained the cost of building the new Creeks Bend access road ($318,090) and divided that cost by the number of residences that were entitled to use that road.  Eleven residences were entitled to use the road (the 10 homeowners in the Creeks Bend subdivision, plus petitioners).  He accordingly determined the value of petitioners' easement to be roughly $29,000 ($318,090 ÷ 11).

Mr. Acquaro-Mignona's approach is not perfect, because petitioners would surely use the access road less frequently than the Creeks Bend homeowners.  But his approach is superior to Mr. Patcella's:  Improvements designed to reduce the risk of accident on the main driveway do not tell us what an easement over the Creeks Bend access road was worth.  We find that Mr. Acquaro-Mignona's ap-

---

⁶(...continued)
viewed as having been supplied by Mr. Zaveta unilaterally, it would constitute an accession to wealth includible in petitioners' gross income.  See Commissioner v. Glenshaw Glass Co., 348 U.S. 426, 431 (1955); Rutkin v. United States, 343 U.S. 130, 137 (1952).

[*52] proach accomplishes rough justice and accordingly conclude that petitioners' charitable contribution deduction must be reduced by $29,000 to account for this return benefit.

To summarize: The fair market value of petitioners' donation to Heritage of a fee simple interest in Parcel A is $2,191,896. The fair market value of petitioners' donation to the Township of a qualified conservation easement over Parcel B is $1,491,896. Reducing the sum of these amounts by $29,000 produces a net charitable contribution of $3,654,792 attributable to these two gifts.

## II. Penalties

The Code imposes a 20% penalty on any underpayment of tax required to be shown on a return that is attributable to "[n]egligence or disregard of rules or regulations" or to a "substantial understatement of income tax." Sec. 6662(a) and (b)(1) and (2). An understatement is "substantial" if it exceeds the greater of $5,000 or 10% of the tax required to be shown on the return. Sec. 6662(d)(1)(A).

The Code alternatively imposes a 20% penalty on any "substantial valuation misstatement." Sec. 6662(a) and (b)(3). A valuation misstatement is "substantial" if "the value of any property * * * claimed on any return * * * is 150 percent or more of the amount determined to be the correct amount." Sec. 6662(e)(1)(A). This penalty is increased to 40% in the case of "gross valuation misstatements."

[*53] Sec. 6662(h).  A misstatement is "gross" if the value of property claimed on a return exceeds 200% of the correct amount.  Sec. 6662(h)(2)(A)(i).

The Commissioner bears the burden of production with respect to the liability of an individual for any penalty.  See sec. 7491(c); Higbee v. Commissioner, 116 T.C. 438, 446 (2001).  If the Rule 155 computations show a substantial understatement of income tax for any of the five years at issue, respondent will have carried his burden of production under section 6662(b)(2) for that year.  See Cooper v. Commissioner, 143 T.C. 194 (2014).

With respect to a "substantial valuation misstatement," respondent has carried his burden of production as to petitioners' contribution of the conservation easement, because the value of that property claimed on their return ($2.35 million) exceeds 150% of the value that we have determined to be correct ($1,491,896).  Respondent has not carried his burden of production as to petitioners' donation of Parcel A, because the value of that property claimed on their return ($2.35 million) does not exceed 150% of the value that we have determined to be correct ($2,191,896).  With respect to a "gross valuation misstatement," respondent has not carried his burden of production as to either property because in neither case did the claimed value exceed 200% of the value that we have determined

[*54] to be correct. (The $29,000 benefit petitioners received from the easement to use the Creeks Bend private road does not affect these determinations.)

A taxpayer may defend against the negligence and substantial understatement penalties by showing that he had "reasonable cause" and "acted in good faith." Sec. 6664(c)(1). The taxpayer bears the burden of proving reasonable cause and good faith. Higbee, 116 T.C. at 446-447. Reasonable cause can be shown by good-faith reliance on the advice of a qualified tax professional. Sec. 1.6664-4(b)(1), (c), Income Tax Regs. To justify such reliance, "[t]he advice must be based upon all pertinent facts and circumstances." Id. para. (c)(1)(i). The reliance defense is not available "if the taxpayer fails to disclose a fact that * * * [he] knows, or reasonably should know, to be relevant to the proper tax treatment of an item." Id.

A taxpayer must meet additional requirements in order to raise a "good faith" defense to the substantial overvaluation penalty. "[W]ith respect to charitable deduction property," this defense may be raised only if the value claimed on the return "was based on a qualified appraisal made by a qualified appraiser" and

**[\*55]** if, "in addition to obtaining such appraisal, the taxpayer made a good-faith investigation of the value of the contributed property." Sec. 6664(c)(3).[7]

We conclude that petitioners are not liable for any penalty. Regarding the negligence and substantial understatement penalties, we find that they relied in good faith on the appraisals performed by Mr. Quinn and on the advice of the tax return preparer who had competently represented them for many years. Mr. Quinn had significant experience valuing real estate in Bucks County. The comparable properties he selected were all located in Bucks County and furnished reasonable comparisons to Parcel A and Parcel B. Petitioners' return preparer was likewise knowledgeable about property donations, including conservation easements. Petitioners made full disclosure of all relevant facts to them both.

Regarding the penalty for substantial valuation misstatement, we find that petitioners satisfied the additional tests that are prerequisite to raising the "good faith" defense. Respondent does not dispute that Mr. Quinn was a "qualified appraiser" or that the appraisal he supplied to petitioners in support of the $2.35 million easement value was a "qualified appraisal." See sec. 6664(c)(3)(A).

---

[7]Before March 30, 2010, section 6664(c)(3) existed as section 6664(c)(2). Health Care and Education Reconciliation Act of 2010, Pub. L. No. 111-152, sec. 14.09(c)(1)(A)-(C), 124 Stat. at 1069

[*56] We also find that petitioners made "a good faith investigation of the value of the contributed property." Petitioners were involved from the outset in the negotiations to formulate a conservation plan that would accomplish all of the parties' goals. They worked with Heritage and the Township and relied on their experts to help determine the appropriate method for making their donations. They hired Mr. Glitzer, a well-respected civil engineer, to sketch a conservation subdivision plan that the Township ultimately approved.

Petitioners were aware of the high demand for land in the Township. They knew the prices that developers had offered for the Rorer Tract, which would have commanded a price of $13.4 million under their own option agreement. Petitioners understood that their property was to be valued according to its highest and best use, which was residential development, and they believed that Mr. Quinn had employed an appropriate valuation methodology. Considering petitioners' testimony and the surrounding facts and circumstances, we conclude that they made "a good faith investigation of the value of the contributed property." See sec. 6664(c)(3)(B).

To reflect the foregoing,

Decisions will be entered

under Rule 155.