T.C. Memo. 2018-65

UNITED STATES TAX COURT

TRIUMPH MIXED USE INVESTMENTS III, LLC, FOX RIDGE
INVESTMENTS, LLC, TAX MATTERS PARTNER, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 20412-14.                    Filed May 15, 2018.

<u>Michael C. Walch</u>, for petitioner.

<u>Rebekah A. Myers</u>, <u>Charles B. Burnett</u>, and <u>S. Mark Barnes</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

BUCH, <u>Judge</u>:  Triumph Mixed Use Investments III, LLC (Triumph), is

subject to the partnership provisions of the Tax Equity and Fiscal Responsibility

Act of 1982, Pub. L. No. 97-248, sec. 402(a), 96 Stat. at 648.  Triumph was one of

a group of entities that were developing a master-planned community on their real

[*2] property in Lehi, Utah, during 2010 and 2011, the years in issue. In an earlier agreement with the city of Lehi, Triumph's parent entities received additional development credits (rights to develop units), which doubled the number of units that they could develop. However, to develop these additional units, these entities were required to follow the city of Lehi's development procedures and receive specific development approvals from the city council. In following these development procedures the entities' development plan was approved by the city council. However, the city council's approval was contingent on the parent entities' dedicating real property to the city and reducing density. Triumph subsequently transferred 746.789 acres and 1,958 development credits to the city of Lehi. After the transfer the entities received another development approval, which allowed them to develop some of the additional units pursuant to the earlier agreement with the city. On its 2011 return Triumph claimed an $11,040,000 charitable contribution deduction for the transfer.

The Commissioner issued a notice of final partnership administrative adjustment (FPAA) for Triumph's 2010 and 2011 returns. The Commissioner determined that Triumph could not deduct the charitable contribution reported for 2011. The Commissioner also determined that Triumph had unreported gross receipts and net earnings from self-employment in the same amount for 2010 and

[*3] 2011.  The Commissioner determined that Triumph could not deduct a long-term capital loss or a bad debt for 2011.  The Commissioner also determined that section 6662(a) and (b) accuracy-related penalties should apply for the years in issue.[1]

Triumph is not entitled to a charitable contribution deduction for 2011.  Triumph transferred the real property and development credits in exchange for a development plan approval and with the expectation of a future development plan approval.  Because these benefits have substantial value and the tax matters partner did not report or value these benefits, Triumph is not entitled to a charitable contribution deduction.

With respect to the other adjustments we find that the Commissioner failed to show some substantive evidence of unreported gross receipts for 2010, and therefore Triumph does not have unreported gross receipts for 2010.  Conversely, the gross receipts were reported for 2011, and we find that the tax matters partner failed to meet its burden to show that Triumph did not have taxable gross receipts.  Because the tax matters partner failed to establish the basis of the property

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code (Code) in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.  All monetary amounts are rounded to the nearest dollar.

[*4] transferred in a settlement, Triumph is not entitled to a long-term capital loss deduction. However, Triumph is entitled to a bad debt deduction because the debt was proximately related to Triumph's trade or business and became worthless. Because Triumph had gross receipts for 2011 that were not reported as net earnings from self-employment, Triumph must recognize the gross receipts as net earnings from self-employment. With respect to the accuracy-related penalty the Commissioner established that Triumph acted negligently with respect to the portion of the underpayment attributable to the charitable contribution deduction, but the Commissioner did not show that it acted negligently with respect to the other adjustments. The penalty for an underpayment due to a substantial understatement of income tax is applicable as it relates to an adjustment to partnership items if the statutory threshold for that penalty is met at the partner level. The tax matters partner did not show that Triumph had reasonable cause and acted in good faith.

FINDINGS OF FACT

Triumph's principal place of business was in Utah when it timely petitioned.

I. <u>The Traverse Entities</u>

During the years in issue Triumph was one of a group of related companies that were developing real property (Traverse property) in Lehi, Utah. Triumph

[*5] was a limited liability company organized in the State of Utah. Triumph was formed in 2003 to "own, purchase, acquire, and finance commercial real estate projects". Fox Ridge Investments, LLC (Fox Ridge), is the tax matters partner of Triumph. Triumph was owned 99.8548% by Fox Ridge and .1452% by Mountain Home Development Corp. (Mountain Home). Fox Ridge was a limited liability company that was classified as a partnership, and Mountain Home was a corporation. Ted Heap was the chief executive officer of Triumph, Fox Ridge, and Mountain Home.[2] Triumph owned 97.89% of Mountain Cove Investments II, LLC (Mountain Cove).

Triumph, Fox Ridge, and Mountain Home (collectively Traverse entities) owned the Traverse property. The Traverse property consisted of approximately 2,800 acres, which encompassed a mixture of relatively flat land, gentle rolling foothills, and steep mountains including a central canyon, which was in the center of the Traverse property.

The Traverse entities were developing the Traverse property into a master-planned community in a multiyear development that became known as the "Traverse Mountain Development". The Traverse property was zoned as a planned community.

---

[2]Mr. Heap indirectly owned 16%-17% of Fox Ridge and Mountain Home.

**[*6]** II.        The City of Lehi Development Procedures

Planned community zones are reserved for large master-planned areas that have a mixture of land uses, including commercial and mixed residential.

When the city of Lehi zones an area as a planned community, the developers must follow a set of procedures before developing the property.  For instance, the property cannot exceed a maximum density of 4.2 units per acre.  Additionally, the property must maintain at least 10% as open space, which is defined as undeveloped, natural grounds.  The city of Lehi's preference is for the property owner to contribute open space to the city; however, other options are available for open space.

The city council must approve development plans.  The Development Review Committee and the Planning Commission first review the plans before they are submitted to the city council.  The Development Review Committee reviews, comments on, and recommends suggestions for the proposed plan.  The proposed plan version is then sent to the Planning Commission. The Planning Commission reviews applications, hears testimony, and recommends to the city council whether to approve the proposed plan.  The city council reviews the proposed plan submitted by the Planning Commission and then makes a determination.

[*7] Developers must have three plans approved by the city council before they can develop a property: a concept plan, an area plan, and a subdivision plat or site plan.

A concept plan is a basic, general land use guide for the property. The concept plan sets the density of the residential areas, commercial areas, and open space areas. The city of Lehi's policy is to take a concept plan through a public hearing process, which allows residents to voice their concerns, because it sets the framework for the future development. After the concept plan is approved, a developer can proceed with an area plan.

An area plan is a detailed and technical land use plan. It is based on an approved concept plan. The area plan uses maps, figures, and tables to show the specific residential uses, commercial uses, and open space. Area plans lay out the density levels in each development zone. Every zone has a maximum number of units that can be built. This number cannot be changed unless the zone is a "flex zone". A flex zone is an area where the lot size is not defined and the number of units allocated to it can be transferred to a different part of the area plan. Transferring credits from a flex zone to another designated area or changing the layout of a flex zone are the only revisions that can be made to an area plan without the city council's approval.

[*8]    After the city council has adopted the area plan, a developer can prepare a subdivision plat or site plan.  The subdivision plats or site plans are the most detailed; they define the boundaries for streets and lots for the development.  After these plans are approved, the developer can move forward with construction.

III.    Purchase of the Property

In 2000 Fox Ridge purchased the Traverse property and other noncontiguous property from Utah Valley Land Co. for $29,606,962.  When Fox Ridge purchased the Traverse property, Fox Ridge and Mountain Home succeeded Utah Valley Land Co. under its annexation and development agreement with the city of Lehi.  In this agreement the city of Lehi annexed the property and zoned it as a planned community.  The city of Lehi agreed that the property owner could develop 3,500 residential units and 370,000 square feet of commercial space.  The parties attached a concept plan to the annexation and development agreement, which followed the parties' agreement.

IV.    Development of the Property

After purchasing the Traverse property, the Traverse entities frequently interacted with the city of Lehi and the city council regarding the development of the Traverse property.  Mountain Home represented Triumph before the city.

**[\*9]**   A.     The 2000 Area Plan

In 2000 the city council approved and adopted the Traverse entities' area plan (2000 area plan). The 2000 area plan reflected a master-planned development. The plan designated the land to be developed in different phases and included areas designated as commercial, mixed-residential, community-facility, and open space.

The 2000 area plan showed that approximately half of the Traverse property would be developed into residential and commercial use and that the other half of the property would remain open space. The plan used all 3,500 units in a mixture of low-, medium-, and high-density development, primarily in the lower, flat half of the property. The plan also provided roughly 1,450 acres of open space in the northern portion of the property. The central canyon was carved out of the open space and designated for 903 high- and low-density residential units.

In approving the 2000 area plan the city council provided that "[i]f a conflict exists between the Annexation and Development Agreement and this Area Development Plan, the Area Development Plan controls."

[*10] B.    The Cabela's Retail, Inc. Deal

After purchasing the Traverse property, the Traverse entities wanted an initial buyer to start the commercial portion of the development. They found Cabela's Retail, Inc. (Cabela's). The Traverse entities, Cabela's, and the city of Lehi entered into an agreement in which the Traverse entities transferred real property to Cabela's.[3] After this transfer, Fox Ridge, Mountain Home, and the city of Lehi amended the annexation and development agreement. By this amendment, the city of Lehi increased the Traverse entities' development credits. Fox Ridge, Mountain Home, and the city of Lehi agreed that the Traverse property had 1,595 acres approved for development and that Fox Ridge and Mountain Home could develop 6,700 residential units with an additional 1,000 bonus units if the units were developed in the commercial area.

The city council increased the density again in approving two new concept plans for the Traverse property in 2007 and 2008. In the amended concept plans Fox Ridge and Mountain Home received additional acreage and development credits. The two concept plans increased the total acreage to 2,801 and the total number of units to 7,982.

---

[3]Mr. Heap believed the real property to be worth $20 million.

[*11] By 2011 the Traverse entities had either built or platted 1,900 units. The Traverse entities had received loans, totaling more than $8,992,307, to develop these units from a group of entities collectively called the "Perry entities".[4] These loans were secured by trust deeds, which encumbered portions of the Traverse property.

C.    Approval of the New Concept Plan

The Traverse entities needed a new concept plan to develop the additional development credits granted in connection with the Cabela's deal. By 2011 Fox Ridge and Mountain Home had rights to develop 7,982 units; however, the 2000 area plan approved only 3,500 units for development. To develop the additional units the Traverse entities were required to follow the development procedures.

To comply with the development procedures, Mountain Home created a new concept plan in 2011 (2011 concept plan). The 2011 concept plan proposed to develop 7,025 units. In this plan the central canyon was designated as a "flex" area, meaning that units could be transferred to the central canyon from other designated areas.

---

[4]The Perry entities consisted of L.H. Perry Investments, LLC, L.R.H. Perry Investment, LLC, Perry Homes Utah, Inc., Perry Development, LLC, Perryhomes, Inc., Perry & Associates, Inc., and Perry & Associates, Inc. Employee Profit Sharing Plan.

[*12] During a meeting on June 1, 2011,[5] Mountain Home requested that the Development Review Committee review the 2011 concept plan. After reviewing the 2011 concept plan, the Development Review Committee stated that the city of Lehi wanted "all open space areas [to] be dedicated to the City and [the areas] will be defined by the Area Plan - the open space dedication should occur concurrently with the recording of the new area plan."

Following that meeting the city of Lehi residents emailed the city's planning director for the project to convey their objections to the 2011 concept plan. The residents were upset because the 2011 concept plan doubled the number of units from the 2000 area plan. Mr. Heap viewed the residents' concerns as typical of residents in a master-planned development because they "don't want anybody else to develop after their house is built."

On July 14, 2011, the Planning Commission met but did not approve the 2011 concept plan. Dozens of the residents of the Traverse Mountain development attended and spoke in opposition to the 2011 concept plan. One resident brought a petition with 150 to 200 signatures of residents opposing the

---

[5]The record is inconsistent regarding when the 2011 concept plan was reviewed by the Development Review Committee. The parties stipulated that the review took place at the June 1, 2011, meeting. Because of the discrepancies, we will use the date in the parties' stipulation.

**[\*13]** 2011 concept plan. The Planning Commission tabled the item to allow time to understand the issues better.

Mountain Home created an amended 2011 concept plan (amended 2011 concept plan). Mr. Heap believed that the concept plan needed to decrease density in order to move forward. The amended 2011 concept plan included the same units as the original plan, but it provided that if the Traverse entities decided to transfer units into the flex area, the total units would not exceed 6,024.

Two weeks later the Planning Commission reconvened and approved the recommendation for the city council to approve the amended 2011 concept plan. The Planning Commission agreed to recommend approval of the amended 2011 concept plan with a total density of up to 6,024 units in accordance with the proposed plan and with the following recommendations: (1) "the City look into a density 'buy down' over a twenty year period" and (2) "[t]he approximate 1,000 acres of open space identified in the Concept Plan, * * * be dedicated to the city for open space and passive recreation such as hiking".

On August 9, 2011, the city council held a hearing at which it discussed the amended 2011 concept plan. Mr. Heap believed that "the only thing that matters is the city council approval." During this meeting Mr. Heap explained that he was

[*14] trying to find the best solution for everyone. He stated that he had been working on the new area plan since 2010 and needed to start construction.

The city council approved the amended 2011 concept plan. However, in approving the plan the city council explicitly rejected Mountain Home's request to exceed 6,024 units if no units were transferred into the flex area. Instead, the city council approved the amended 2011 concept plan based on the following conditions:

> 1) That the open space in the canyon areas be dedicated to the City as proposed in the Development Review Committee's General Comment * * * and by the Planning Commission. * * *
> 2) That the total number of units is not to exceed 6,024, which number is to be used in totality even if units are transferred to the business park/flex area. If any units are transferred to the business park/flex area, those units are to be taken from the Central Canyon area.

At the time the city council granted conditional approval, all of the Traverse entities' loans from the Perry entities were in default. The Traverse entities entered into a global settlement agreement with the Perry entities on September 23, 2011. In the global settlement agreement the Perry entities agreed to not foreclose and to discharge all of the Traverse entities' obligations in exchange for conveyance of the encumbered property. In the agreement the Traverse entities agreed to "diligently pursue the completion and approval by Lehi city (with a goal

[*15] of achieving final approval prior to December 31, 2011) of the new Area Plan * * * in accordance with the approved Concept Land Use Plan". And they agreed that if the Traverse entities failed to receive approval within eight months, the Perry entities could take over the area plan process.

Fox Ridge, Mountain Home, and the city of Lehi negotiated and agreed to decrease density in exchange for water rights to the Traverse Mountain development. They amended their annexation and development agreement on October 18, 2011. The parties submitted that they "have worked together to reduce the overall density in the Traverse Mountain Area Plan in exchange for the City's agreement to provide water rights for additional residential dwelling units within the Traverse Mountain Project."[6] They agreed that "[t]he number of residential units in the Traverse Mountain Concept Plan adopted by the Lehi City Council * * * are hereby reduced from 6,024 to 5,812", a 212-unit reduction. The city of Lehi agreed to increase the water rights to the units in the Traverse Mountain development from 3,227 to 5,812 units.

---

[6]Fox Ridge, Mountain Home, and the city of Lehi entered into several agreements related to water rights for the units in the Traverse Mountain development. The city of Lehi agreed in September 2010 to provide water for up to 3,227 units.

**[*16]** Mountain Home finished its amended area plan (2012 area plan), and the Traverse entities needed to get that plan approved. The 2012 area plan provided that the development would not exceed 5,812 units. Mr. Heap believed that the 2012 area plan gave the developer the right to start developing the Traverse property. He explained that the Traverse entities "want[ed] to move forward, but it was difficult". He said that he "wanted to end any conflicts in the City and those relating issues."

The Planning Commission met on December 8, 2011, and approved the recommendation for the city council to approve the 2012 area plan. During this meeting Mr. Heap explained that "[w]e are desperately trying to move this forward; it's in everybody's best interest to move this forward--there are significant financial impacts." At trial Mr. Heap explained that his desperation was also related to wanting to "make sure that the residents were happy." At the end of the meeting the Planning Commission agreed to approve Mountain Home's request for the 2012 area plan if the 2012 area plan included all revised Development Review Committee comments.[7] The Traverse entities submitted the 2012 area plan to the city council.

---

[7]The revised Development Review Committee comments are not in evidence.

[*17] D.    Transfer to the City of Lehi

On December 29, 2011, the following transactions occurred:

• Fox Ridge, Mountain Home, and the city of Lehi amended their annexation and development agreement. They agreed that the October 18, 2011, amendment contained factual errors in that the parties agreed only to reduce the number of units by 212. They agreed that the correct number of units immediately following the October 18, 2011, amendment was 7,770 units.

• Fox Ridge transferred 63.052 acres to Triumph.[8]

• The Traverse entities and the city of Lehi entered into an agreement for a charitable donation, describing the terms of the agreement. In this agreement the Traverse entities recited that Triumph owns real property and that the Traverse entities have

> disposed of portions of the Traverse Property and Units, and have now determined to seek approval of plans for development of their property which would not use all of the Units remaining available to them for such development, and although such Units have value and could be so used, the Traverse Entities now desire to cause the Property to be donated to the City in connection and together with an agreed upon reduction of the Units available for development of the

---

[8]The tax matters partner submitted various deeds showing Triumph's ownership of the Traverse property. Triumph owned parcel No. 11-013-0139. We take judicial notice of the Utah County Parcel Maps. See Fed. R. Evid. 201(b)(2). We find that following the transfer from Fox Ridge, Triumph owned the Traverse property transferred to the city of Lehi.

**[\*18]** Traverse Property of 1,958 (the "Donated Units"), and the City wishes to accept the Property and the Donated Units from the Traverse Entities \* \* \*[9]

The city of Lehi and the Traverse entities did not include any value for any consideration received and instead stated that the Traverse entities received "[n]o consideration." This "no consideration" clause provided:

> The donation of the Property and the Donated Units by Triumph Mixed Use to the City is a voluntary charitable donation. None of the Traverse Entities nor any party related to any of the Traverse Entities has received, is receiving, or proposes to receive any compensation, development benefits, concessions, or approvals of any kind whatsoever, including enhancement of any land owned by any of them, from the City as consideration for Triumph Mixed Use's donation of the Property and the Donated Units. Approval of plans for development of real property other than the Property by the Traverse Entities is in no way contingent upon or subject to the donation of the Property or the Donated Units to the City.

Under the terms of the documents, the city of Lehi did not incur any obligations in connection with the transfer and the Traverse entities did not have any recourse if they did not get plan approvals. The attorney for the city of Lehi agreed that the city did not incur any obligations to provide future approvals to the property owner.

• Triumph executed three quitclaim deeds to the city of Lehi, by which it transferred 746.789 acres to the city of Lehi.

---

[9]This transfer returned the units to 5,812.

[*19] • The Traverse entities and the city of Lehi entered into an assignment of development rights agreement. In this agreement the Traverse entities agreed that Mountain Home and Fox Ridge were joining "to the extent of any interest any of them hold or may hold in the Donated Units, and agree and represent to the City that Triumph Mixed Use is the sole owner of the Donated Units with full rights to transfer same to the City".

With the completion of all of these events, Fox Ridge and Mountain Home had returned their development credits to 7,700 from 5,812; Fox Ridge transferred real property to Triumph; and Triumph transferred 746.789 acres and 1,958 development credits to the city of Lehi, which had the effect of returning the development credits to 5,812. The contingencies of the amended 2011 concept plan being satisfied, the amended 2011 concept plan was approved.

E.    Approval of the Area Plan

On January 24, 2012, the city council held a hearing in which it approved the 2012 area plan after a finding that the 2012 area plan was consistent with the amended 2011 concept plan and the numerous items to be accomplished as part of approving the 2012 area plan.

**[\*20]** V.     Appraisal of the Transfer

In January 2012 Triumph retained J. Philip Cook & Associates, LLC, to appraise the transfer.  J. Philip Cook and Travis E. Reeves prepared an appraisal, dated February 1, 2012.  They concluded that as of December 29, 2011, the market value of the property and the development credits was $11,040,000 using the "before and after" approach for valuation.  They did not include any value for consideration received.

VI.     Triumph's Other Business Transactions

Triumph made deals with other corporations involved in the development of the Traverse property while awaiting approval of the 2012 area plan.  In 2010 Triumph pledged its separately owned property to the Perry entities to enable Mountain Home to receive a loan.  Triumph transferred this property to the Perry entities when Mountain Home defaulted on this loan in 2011.

In 2011 Triumph made payments on behalf of Mountain Cove for property taxes and settlement costs.  Mountain Cove gave Triumph a promissory note in the amount of $51,868, certifying it would repay Triumph.  Later in 2011 Mountain Cove's property was foreclosed upon.  Mountain Cove did not repay Triumph.

**[*21]** VII.   Return Preparation and Returns

In 2011 Triumph turned to its accountant to file its returns.  Scott Rasmuson had been preparing Triumph's Forms 1065, U.S. Return of Partnership Income, since 2005.  He has 25 years of experience as a public accountant and is a certified public accountant.  His clients include real estate developers and construction contractors.

To prepare Triumph's returns Mr. Rasmuson reviewed Triumph's general ledger, its trial balances, and its subsidiaries' and parent entities' returns.  He also discussed the returns with Triumph's internal accounting team.

A.   2010 Return

Several entries on Triumph's 2010 return are relevant to issues before us. On its 2010 Form 1065 Triumph reported that it was an investor and that its principal investment was real estate.  Triumph reported a capital contribution of $8,833,645.  It did not report gross receipts or net earnings from self-employment.

On a previous 2008 return Triumph had reported a $12,145,000 installment sale.  For 2010 Triumph did not report any payment with respect to that installment sale.  Mr. Rasmuson testified that this installment sale had been improperly reported on Triumph's 2008 return.  He claimed that no sale ever occurred and that Triumph's books and records did not reflect such sale.

**[*22]** B.    2011 Return

As with its 2010 return, several entries on Triumph's 2011 return are relevant to issues before us.  On its 2011 Form 1065 Triumph reported that it was an investor and that its principal investment was real estate.

1.    Charitable Contribution

Triumph included a Form 8283, Noncash Charitable Contributions.  On the Form 8283 Triumph claimed an $11,040,000 noncash charitable contribution deduction for transferring 746.789 acres and 1,958 development credits to the city of Lehi.  Triumph attached the appraisal report prepared by J. Philip Cook & Associates, LLC, to its 2011 return.  Triumph did not report any consideration received.

2.    Gross Receipts

Triumph did not report gross receipts or net earnings from self-employment. Triumph included a Form 6252, Installment Sale Income, and reported that it sold real estate on December 31, 2007, that it had acquired in 2005.  Triumph reported that it had $332,054 of installment income based on a $586,800 payment and a computed gross profit percentage of 56.587%.  Triumph also reported that it received investment income of $48,648.  Triumph had previously reported on its

[*23] 2010 return that it sold this property to Mountain Home and that Triumph had a cost basis of $254,746.

During trial Mr. Rasmuson testified that the transaction was not an installment sale between Triumph and a related party; instead, as he saw it, it was a transaction between a related party and Chapel Ridge Investments III (Chapel Ridge) and the obligation was contributed to Triumph as a capital contribution in 2010. He explained that in 2011 the installment obligation was paid by a property transfer that satisfied the installment obligation with principal and interest. The tax matters partner did not provide any documentation regarding this transaction.

### 3. Long-Term Capital Loss

Triumph included a Schedule D, Capital Gains and Losses, on which it reported an $806,745 long-term capital loss. Triumph reported that it acquired the real property in 2000, that the property had a cost basis of $873,897, and that it sold it on September 15, 2011, for $67,152. Triumph used the $806,745 loss to offset the installment sale income of $332,054. Thus, Triumph reported a $474,691 net long-term capital loss.

This loss relates to the real property that Triumph had pledged to the Perry entities in 2010 as collateral that enabled Mountain Home to receive a loan from the Perry entities. Mountain Home defaulted on the loan in 2011, and the Traverse

[*24] entities (and related parties) and the Perry entities entered into an agreement whereby Triumph transferred the pledged property to the Perry entities in 2011.

### 4. Short-Term Capital Loss

Triumph reported a $51,869 short-term capital loss on the Schedule D. This loss relates to a bad debt deduction. In 2011 Triumph made payments on behalf of Mountain Cove. In exchange Triumph received a promissory note. Mountain Cove defaulted on that note. Triumph claimed a short-term capital loss deduction in the amount of the promissory note.

## VIII. FPAA

On June 5, 2014, the Commissioner issued an FPAA for 2010 and 2011 to Triumph's tax matters partner. In the FPAA the Commissioner made various adjustments and determined penalties. For 2010 the Commissioner increased gross receipts by $8,833,645 and increased net earnings from self-employment by the same amount. For 2011 the Commissioner disallowed a charitable contribution deduction of $11,040,000, increased gross receipts by $636,608 and increased net earnings from self-employment by the same amount, disallowed a long-term capital loss deduction of $541,843, and disallowed a short-term capital loss deduction of $51,869. The Commissioner also determined that accuracy-

[*25] related penalties apply. The tax matters partner timely filed a petition disputing each adjustment.

IX.   Trial

Trial was held in Salt Lake City, Utah, on October 25 and 26, 2016. At trial the Court recognized Jeremie Snowder as a real estate valuation expert. Mr. Snowder submitted an expert report in which he concluded that the value of the property transferred was $5,050,000. During trial the tax matters partner submitted copies of certain of Triumph's accounting records to show tax bases of its property. However, these records combine the tax bases of all the property owned by the entities.

## OPINION

With respect to the charitable contribution deduction, the parties principally dispute whether Triumph had the requisite donative intent. We must also decide whether Triumph had unreported gross receipts; whether Triumph had a long-term capital loss; whether Triumph was entitled to a bad debt deduction; whether Triumph failed to report net earnings from self-employment; and whether Triumph is liable for accuracy-related penalties. We address each in turn.

**[*26]** I.     <u>Burden of Proof</u>

In general, the Commissioner's determinations are presumed correct, and a taxpayer bears the burden of proving otherwise.[10] The burden of proof includes the burden of proving entitlement to any claimed deduction.[11]

When a case involves unreported income, the U.S. Court of Appeals for the Tenth Circuit, to which this case is appealable, has held that the Commissioner's determination of unreported income is entitled to a presumption of correctness once some substantive evidence is introduced demonstrating that the taxpayer received unreported income.[12] Once the Commissioner introduces some substantive evidence linking the taxpayer with the income, the presumption of correctness applies and the burden shifts to the taxpayer to produce substantial evidence overcoming it.[13]

---

[10]Rule 142(a); <u>Welch v. Helvering</u>, 290 U.S. 111, 115 (1933).

[11]Rule 142(a); <u>INDOPCO, Inc. v. Commissioner</u>, 503 U.S. 79, 84 (1992) (explaining that deductions are a matter of legislative grace).

[12]<u>United States v. McMullin</u>, 948 F.2d 1188, 1192 (10th Cir. 1991); <u>Erickson v. Commissioner</u>, 937 F.2d 1548, 1551 (10th Cir. 1991), <u>aff'g</u> T.C. Memo. 1989-552; <u>Green v. Commissioner</u>, T.C. Memo. 2016-67, at *24; <u>Lamb v. Commissioner</u>, T.C. Memo. 2013-155, at *13.

[13]<u>McMullin</u>, 948 F.2d at 1192; <u>Erickson v. Commissioner</u>, 937 F.2d at 1551; <u>Green v. Commissioner</u>, at *24; <u>Lamb v. Commissioner</u>, at *13.

**[*27]** Section 7491(a) provides an exception that shifts the burden of proof to the Commissioner as to any factual issue relevant to a taxpayer's liability if the taxpayer provides credible evidence with respect to that issue and also substantiates the item, maintains records, and cooperates with the Commissioner's reasonable requests for information. Taxpayers bear the burden of proving that they have met the section 7491(a) requirements.[14]

The tax matters partner raised section 7491 for the first time in its reply brief. Its attempt to raise this argument on reply brief is untimely and thus prejudicial to the Commissioner.[15] Moreover, even if the tax matters partner had properly raised this argument, the tax matters partner has not shown that Triumph has met the requirements of section 7491(a), and therefore the tax matters partner has not met its burden.[16]

---

[14]Rolfs v. Commissioner, 135 T.C. 471, 483 (2010), aff'd, 668 F.3d 888 (7th Cir. 2012).

[15]Kansky v. Commissioner, T.C. Memo. 2007-40, 93 T.C.M. (CCH) 921, 924 (2007).

[16]By separate order dated May 7, 2018, denying a motion to reopen the record we have addressed the effect of section 7491(c) on this case.

**[\*28]** II.     Charitable Contribution

Triumph claimed a charitable contribution deduction of $11,040,000.  We must determine whether Triumph actually made a charitable contribution or whether the transfer was part of a quid pro quo arrangement as the Commissioner alleges.  If Triumph is entitled to the deduction, we must determine the value of that transfer.

A.     Charitable Contribution Principles

Section 170(a)(1) provides that a taxpayer may deduct any charitable contribution made in the taxable year.  A charitable contribution is defined as a contribution or gift to or for the use of a qualified recipient.[17]

If a taxpayer makes a charitable contribution of property other than money, the amount of the contribution is the fair market value of the property at the time of the contribution.[18]  The fair market value is equal to the price at which the property would change hands between a willing buyer and willing seller having no

_____

[17]Sec. 170(c).  The parties do not dispute that the city of Lehi is a qualified recipient.

[18]Rolfs v. Commissioner, 135 T.C. at 480; sec. 1.170A-1(c)(1), Income Tax Regs.

**[*29]** obligation to buy or sell and having reasonable knowledge of the relevant facts.[19]

A contribution of property generally will not "constitute a charitable contribution if the contributor expects a substantial benefit in return."[20] However, a taxpayer may still deduct a contribution of property if (1) the value of the property transferred to charity exceeds the fair market value of any goods or services received in exchange and (2) the excess payment is made "with the intention of making a gift."[21]

If the taxpayer claims a deduction for a charitable contribution, then the taxpayer must meet substantiation requirements. If the value of the property contributed is $250 or more, then the contribution must be substantiated with a contemporaneous written acknowledgment from the qualified recipient.[22] The doctrine of substantial compliance does not apply to excuse compliance with the

---

[19]Rolfs v. Commissioner, 135 T.C. at 480-481; sec. 1.170A-1(c)(2), Income Tax Regs.

[20]United States v. Am. Bar Endowment, 477 U.S. 105, 116-118 (1986) ("The sine qua non of a charitable contribution is a transfer of money or property without adequate consideration."); Rolfs v. Commissioner, 135 T.C. at 480.

[21]Am. Bar Endowment, 477 U.S. at 117; Rolfs v. Commissioner, 135 T.C. at 486; sec. 1.170A-1(h)(1), Income Tax Regs.

[22]Sec. 170(f)(8)(A).

[*30] substantiation requirements of section 170(f)(8)(B).[23] Moreover, if the contributed property is valued in excess of $500,000, the taxpayer must obtain a qualified appraisal and attach the appraisal to the return.[24]

The Commissioner challenges Triumph's deduction on several grounds, asserting: (1) the transfer was not a charitable contribution in that it was part of a quid pro quo arrangement in which the Traverse entities received development approvals; (2) the transfer was not valid because Triumph did not own the property or development credits; (3) the contemporaneous written acknowledgment was not valid because it did not value the consideration received; (4) the appraisal was not a qualified appraisal; and (5) the value of the transfer was overstated. The tax matters partner disagrees with the Commissioner's arguments and alleges that Triumph is entitled to the deduction. Because we find that the transfer to the city of Lehi was part of a quid pro quo arrangement and that Triumph has not proven that it made any excess payment, the transfer does not qualify as a charitable contribution. Therefore, we do not need to address the other grounds raised by the Commissioner.

---

[23]15 West 17th St. LLC v. Commissioner, 147 T.C. 557, 562-563 (2016); Durden v. Commissioner, T.C. Memo. 2012-140, 103 T.C.M. (CCH) 1762, 1764 (2012).

[24]Sec. 170(f)(11).

**[\*31]** B.     Quid Pro Quo Exchange

In determining whether a payment is a contribution or gift, the relevant inquiry is whether the transaction in which the payment is involved is structured as a quid pro quo exchange.[25]  In ascertaining whether a given payment was made with the expectation of any quid pro quo, courts examine the external features of the transaction.[26]  This determination avoids the imprecise inquiry into the subjective motivations of the taxpayer.[27]

"The relevant question is whether the taxpayer expected a benefit in return for the payment; deductibility does not depend on what type of benefit the taxpayer received."[28]  Moreover, "in determining whether a quid pro quo existed that defeats donative intent," we will not disregard consideration actually received

---

[25]Hernandez v. Commissioner, 490 U.S. 680, 701-702 (1989); Rolfs v. Commissioner, 135 T.C. at 480; McGrady v. Commissioner, T.C. Memo. 2016-233, at \*20.

[26]Hernandez v. Commissioner, 490 U.S. at 690-691; Christiansen v. Commissioner, 843 F.2d 418, 420 (10th Cir. 1988).

[27]Hernandez v. Commissioner, 490 U.S. at 690-691; Christiansen v. Commissioner, 843 F.2d at 420; Seventeen Seventy Sherman St., LLC v. Commissioner, T.C. Memo. 2014-124, at \*24.

[28]Christiansen v. Commissioner, 843 F.2d at 420.

**[\*32]** simply because it is hard to quantify.[29]  On the other hand mere incidental benefits will not defeat a charitable contribution deduction.[30]

The benefit that the taxpayer receives does not have to be financial.[31]  We have observed that medical, educational, scientific, religious, or some other benefits or privileges may constitute consideration that defeats charitable intent.[32] We have found that a transfer of real property in exchange for development approvals or the expectation of future development approvals is a benefit and precludes a finding of the requisite donative intent for a charitable gift.[33]

In Seventeen Seventy Sherman St., LLC v. Commissioner, T.C. Memo. 2014-124, we denied a taxpayer's charitable contribution deduction because the taxpayer received a zoning change and because the taxpayer expected that a recommendation from the community planning agency would increase the

---

[29]Derby v. Commissioner, T.C. Memo. 2008-45, 95 T.C.M. (CCH) 1177, 1190 (2008).

[30]Sutton v. Commissioner, 57 T.C. 239, 243 (1971); McGrady v. Commissioner, at \*25.

[31]Seventeen Seventy Sherman St., LLC v. Commissioner, at \*23-\*24.

[32]Seventeen Seventy Sherman St., LLC v. Commissioner, at \*23-\*24.

[33]See Pettit v. Commissioner, 61 T.C. 634, 640-641 (1974); Sutton v. Commissioner, 57 T.C. at 243; Seventeen Seventy Sherman St., LLC v. Commissioner, T.C. Memo. 2014-124; Pollard v. Commissioner, T.C. Memo. 2013-38; Forkan v. Commissioner, T.C. Memo. 1977-195.

[*33] likelihood that the taxpayer would receive a plan approval. In that case, the taxpayer owned both a shrine that had previously been designated a landmark and a nearby parking lot. The taxpayer wanted to develop the parking lot for commercial use but needed new zoning permits to do so. The community planning agency and the taxpayer negotiated and agreed that the community planning agency would recommend approval of a zoning change to allow the taxpayer to develop the parking lot. They further agreed that if the zoning change was approved, the taxpayer would grant conservation easements to preserve the shrine. The zoning application was approved, and the taxpayer executed a conservation easement.

We denied a deduction for the conservation easement because the taxpayer granted the easement in exchange for zoning changes and with the expectation that the planning agency's recommendation would substantially increase the likelihood that the planning board would approve the permit.[34] We found that the taxpayer highly valued and negotiated for this recommendation and used the easement as leverage to obtain it. Because the taxpayer did not value the benefit as part of the quid pro quo exchange, we denied the taxpayer's deduction.

---

[34]Seventeen Seventy Sherman St., LLC v. Commissioner, at *30-*31.

**[*34]** Likewise, in <u>Pollard v. Commissioner</u>, T.C. Memo. 2013-38, we denied the taxpayer's charitable contribution deduction because the external features of the transaction showed that the taxpayer granted the easement in exchange for approval for his subdivision exemption request. In <u>Pollard</u> the taxpayer wanted to develop a second home on his property. Because building a new home would increase the density beyond what was allowed, the taxpayer first needed subdivision exemption approval. Before the Board of County Commissioners would approve the exemption plat documents, the taxpayer had to grant conservation easements. The taxpayer granted the easements, and the county exempted his land and approved the development of a second home. Although the approval of the request was not the final step in the subdivision exemption process, the taxpayer conveyed the easements in order to get this approval. The Court held that the taxpayer's contribution was part of a quid pro quo exchange and was conveyed as a bargaining chip for approval of the subdivision exemption.[35]

Upon finding that a taxpayer has received a benefit in exchange for the transfer, we employ a two-part test to determine whether the taxpayer may claim any portion as a deduction: We must value the transfer, and we must value the

---

[35]<u>Pollard v. Commissioner</u>, at *20-*21.

[*35] consideration received in exchange.[36]  But if a taxpayer fails to specify the value of any benefit received, then the taxpayer fails to comply with section 170 and the regulations, and no deduction is allowed.[37]  Because we find that Triumph's transfer was part of a quid pro quo arrangement in which Triumph received substantial value, and the tax matters partner failed to value the consideration received, we hold that Triumph is not entitled to a deduction.

### 1.     The External Factors Demonstrate Consideration

The tax matters partner argues that Triumph is entitled to a deduction because it transferred the 746.785 acres of real property and 1,958 development credits without consideration.  The tax matters partner argues that the agreement for charitable contribution demonstrates that Triumph did not receive any consideration, or that even if Triumph did receive some consideration, it was incidental.  We disagree.  In exchange for transferring this property, Triumph received the city council's approval of the concept plan and the expectation that the city council would approve the area plan.

---

[36]See Rolfs v. Commissioner, 135 T.C. at 488-489; Seventeen Seventy Sherman St., LLC v. Commissioner, at *27; sec. 1.170A-1(h)(1), Income Tax Regs.

[37]Seventeen Seventy Sherman St., LLC v. Commissioner, at *27; Pollard v. Commissioner, at *19 n.9; Derby v. Commissioner, 95 T.C.M. (CCH) at 1189.

[*36] The transfer of real property and development credits was integral to the city council's approval of both plans.[38] The external features of the transaction demonstrate that the real property and development credits were transferred in exchange for the concept plan approval. The Traverse entities desperately wanted to have their new area plan approved to allow them to develop the additional units received in the Cabela's deal. However, before the city council would approve the area plan, the Traverse entities needed to get a new concept plan approved.

When the Traverse entities submitted the new concept plan, they were met with public opposition and resistance from the Planning Commission. The obstacles that the Traverse entities needed to overcome were the demands for more open space and a reduction in density. The city council's solution was to require the Traverse entities to dedicate open space and reduce density before the concept plan was approved.

After receiving contingent approval, the Traverse entities finished the area plan; and the Planning Commission approved the Traverse entities' request for

---

[38]Although Triumph was a distinct entity from Mountain Home, which was presenting the plans to the city of Lehi, Mountain Home represented Triumph before the city. Moreover, the record demonstrates that the Traverse entities were working together to develop the Traverse property.

**[*37]** recommendation of area plan approval.[39]  Triumph subsequently executed

the agreement for charitable contribution thus satisfying the city council's demand

for more open space.[40]  At its next meeting the city council approved the 2012 area

plan.  Thus, the Traverse entities' entire course of dealing with the city of Lehi

shows that Triumph transferred the real property and development credits as part

of a negotiation in which the city of Lehi received open space and the Traverse

entities received as a quid pro quo concept plan approval.

Triumph also transferred the real property and development credits with the

expectation that the Traverse entities would receive an area plan approval.

Because an area plan was required to closely follow the concept plan, the Traverse

---

[39]The tax matters partner argues that the city council's condition was dropped because it was not re-raised at this hearing.  We disagree.  The amended 2011 concept plan was explicitly approved with conditions.  Moreover, the Traverse entities completed the contingencies, which shows that they did not treat the condition as having been dropped.

[40]The Commissioner has a continuing objection to Exhibit 10-P, the December 29, 2011, amended annexation and development agreement.  The Commissioner argues that this document lacks authenticity.  We follow the Federal Rules of Evidence.  Sec. 7453; see also Rule 143(a).  Fed. R. Evid. 901(b)(1) provides that testimony of a witness with knowledge satisfies the authentication requirements.  Both Mr. Heap and the attorney for the city of Lehi identified this document.  The document is admitted.
   The Commissioner's remaining evidentiary objections are not discussed in his briefs.  We deem these objections abandoned.  See Rybak v. Commissioner, 91 T.C. 524, 566 n.19 (1988).

[*38] entities expected the city council to approve the area plan after satisfaction

of the contingencies that they had negotiated for the concept plan.  Indeed, the city

council approved the area plan on the finding that the Traverse entities had

satisfied the contingencies in the concept plan approval.  Accordingly, we also

find that the Traverse entities transferred the real property and development credits

because they believed that this transfer would lead to the city council's approving

their area plan.

The linchpin of the tax matters partner's argument is that the agreement for

charitable contribution provides that Triumph received no consideration.[41]  We

give little or no weight to this provision.  As explained above, we do not look only

to the transfer documents; we examine the external features of the transaction.[42]

And the external features of this transaction leave no doubt that Triumph

---

[41]The tax matters partner asserts that the witnesses' testimony shows that Triumph did not receive any consideration.  Mr. Heap and the attorney for the city of Lehi testified that the city council was not required to approve the Traverse entities' development plans.  We are not persuaded.  We look to the external features of the transaction to see whether the taxpayer received consideration. Hernandez v. Commissioner, 490 U.S. at 690-691; Christiansen v. Commissioner, 843 F.2d at 420.

[42]Hernandez v. Commissioner, 490 U.S. at 690-691; Christiansen v. Commissioner, 843 F.2d at 420.

**[\*39]** transferred the real property and the development credits for consideration in the form of approval of the concept plan and the 2012 area plan.

The tax matters partner argues that, even if we find that Triumph received a benefit in exchange for the transfer, we should find that it was an incidental benefit of little or no value. The tax matters partner relies on McGrady v. Commissioner, T.C. Memo. 2016-233, in which we held that the gift was not conditioned on a return benefit. In McGrady, the taxpayers owned two parcels that were surrounded by three other parcels that would be developed into residential units. A township in Bucks County, Pennsylvania, was committed to conserving the land. The taxpayers, the township, the owner of the surrounding land, and a developer discussed conservation and development plans. Following these negotiations, the parties executed a six-step plan in which the taxpayers granted a conservation easement on the parcel that held their residence, made a contribution to a qualified recipient of the second parcel, and bought back a U-shaped portion of conserved land that surrounded their residence. We found that the taxpayers were entitled to the deduction because they did not receive any return benefit.[43] We held that the Township acted single-mindedly for a conservation purpose and the taxpayers had no power to manipulate the

---

[43]McGrady v. Commissioner, at \*21.

[*40] negotiation.[44]  We explained that "[w]henever a homeowner places a conservation easement over his property * * *, the homeowner in a sense 'benefits' by having natural landscapes rather than suburban sprawl in his immediate surroundings * * * [b]ut petitioners were mere incidental beneficiaries of this action."[45]

We disagree that the benefit Triumph received was merely incidental.  In McGrady the only benefit we found was that the taxpayer received a small benefit of privacy.[46]  In this case the Traverse entities requested and received approval of their concept plan and expected that their area plan would be approved.  This is a benefit of considerable value to a real estate developer.

Thus, we conclude that Triumph transferred the real property and the development credits to the city of Lehi in exchange for the benefit of their concept plan's approval and the expectation that it would lead to approval of their area plan.  We find that this benefit was not incidental to the transfer.

---

[44]McGrady v. Commissioner, at *23.

[45]McGrady v. Commissioner, at *24-*25.

[46]McGrady v. Commissioner, at *24-*25.

**[\*41]**    2.    Value of the Consideration Received

When a taxpayer makes a charitable contribution and receives a benefit, the taxpayer's deduction is limited to the portion of the payment that exceeds the fair market value of the goods or services received.[47]  The tax matters partner argues that the plan approvals had no value and that the transfer reduced the value of their property.  We disagree.

The immediate approval of the concept plan and the ensuing approval of the 2012 area plan had significant value.  The concept plan approval was necessary to enable the Traverse entities to develop additional units.  The approval of the concept plan moved the Traverse entities closer to developing the units they acquired in the Cabela's deal.  Indeed, Mr. Heap explained that the transaction was beneficial because it was "good to move forward."  The Traverse entities also anticipated that their donation to the city would ensure approval of the area plan.  This approval also had significant value.  The area plan approval would allow the Traverse entities to develop 5,812 units instead of 3,500 units.  And following the transfer, the area plan was approved.  Because we find that Triumph received a significant benefit and the tax matters partner failed to report or establish the value

---

[47]Rolfs v. Commissioner, 135 T.C. at 486; sec. 1.170A-1(h)(1), Income Tax Regs.

[*42] of the consideration received, we find that Triumph is not entitled to a charitable contribution deduction.[48]

In conclusion, the Traverse entities' entire course of dealings with the city of Lehi demonstrates that Triumph received a development plan approval and the expectation of a future development plan approval in exchange for transferring the real property and development credits. We find that Triumph received a substantial benefit and also failed to show the value of the consideration. Thus Triumph may not deduct a charitable contribution.

III.     Gross Receipts

Triumph did not report gross receipts on its 2010 return and did not report the disputed gross receipts for 2011 as taxable on its 2011 return. In the FPAA the Commissioner adjusted Triumph's gross receipts by $8,833,645 and $636,608 for 2010 and 2011, respectively.

---

[48]In failing to value the consideration received, Triumph may not have satisfied the requirements of section 170(f)(8)(B)(ii). See Viralam v. Commissioner, 136 T.C. 151, 170-171 (2011) (denying a charitable contribution deduction for failure to comply with section 170(f)(8) when the taxpayer received goods or services but the contemporaneous written acknowledgment did not report any consideration received).

**[*43]** A.     2010 Unreported Income

The tax matters partner alleges that Triumph had no gross receipts for 2010. When a case involves unreported income, the U.S. Court of Appeals for the Tenth Circuit requires the Commissioner to provide substantive evidence that the taxpayer received unreported income.[49]

The Commissioner determined that Triumph had unreported income for 2010 of $8,833,645.[50]  The Commissioner contends that a $12,145,000 installment sale occurred in 2008.  At trial Mr. Rasmuson testified that he improperly reported that amount as an installment sale in 2008 and that Triumph's books and records did not reflect the sale.  The Commissioner alleges in his answering brief that Triumph's general ledger shows that in 2010 Triumph's receivables from Mountain Home were reduced from $12,731,800 to $2,183,793.  The Commissioner explains that the FPAA erroneously determined that the amount of the reduction was $8,833,645; the reduction was actually $10,548,007.

---

[49]McMullin, 948 F.2d at 1192; Erickson v. Commissioner, 937 F.2d at 1551; Green v. Commissioner, at *24; Lamb v. Commissioner, at *13.

[50]This is the same amount as a capital contribution that Triumph reported on its 2010 return.  The parties do not raise any arguments that the capital contribution should be adjusted.

**[\*44]** We disagree with the Commissioner. There is no evidence of unreported income whether $10,548,007 or $8,833,645 or some other amount for 2010. Moreover, there is no evidence of a 2008 transaction that would lead to this income. The only discussion of the adjustment comes from Mr. Rasmuson who credibly testified that he improperly reported an installment sale but that Triumph's books and records did not reflect the sale. We hold that the Commissioner did not provide substantive evidence linking Triumph with any unreported income. Accordingly, Triumph does not have unreported gross receipts for 2010.

### B.    2011 Additional Income

The tax matters partner alleges that Triumph has no unreported gross receipts for 2011. The Commissioner determined that Triumph had unreported gross receipts of $636,608 for 2011 from the sale of property to Mountain Home and that the tax matters partner did not establish any basis in the property. The tax matters partner acknowledges that in 2011 there was a transfer of property to Triumph for $636,608 and that Triumph reported the payment as installment sale income and interest. The parties agree this payment stems from a 2007 installment sale of real property for $585,000. However, the tax matters partner claims that

**[\*45]** the 2007 installment sale occurred between a related party and Chapel Ridge and that the indebtedness on that sale was contributed to Triumph in 2010.

We find that the tax matters partner has not met its burden. Although the tax matters partner alleges that Triumph was not involved in the installment sale until the obligation was contributed to Triumph in 2010, the tax matters partner did not produce any evidence other than uncorroborated testimony of Mr. Rasmuson. We are not required to accept such testimony.[51] The tax matters partner did not produce any evidence of a novation of the installment obligation or any evidence that Triumph replaced the seller in the transaction. Thus, we find that the tax matters partner has not met its burden. We sustain the Commissioner's determination.

IV.    Long-Term Capital Loss

The tax matters partner alleges that Triumph sustained a long-term capital loss in 2011. Section 165(a) generally permits taxpayers to deduct "any loss sustained during the taxable year and not compensated for by insurance or otherwise." Section 1001(a) provides that the loss is the excess of the adjusted basis over the amount realized. Losses from sales or exchanges of capital assets

---

[51]See Tokarski v. Commissioner, 87 T.C. 74, 77 (1986).

**[\*46]** are allowed as deductions only to the extent provided in sections 1211 and 1212.[52]

The tax matters partner asserts that Triumph had a long-term capital loss of $806,745 in 2011. The tax matters partner alleges that Triumph is entitled to deduct a long-term capital loss because it provided Mountain Home real property to be used as collateral, Mountain Home defaulted on that loan, the Perry entities went to foreclose, and Triumph conveyed the property in lieu of foreclosure.

We disagree. Triumph is not entitled to a long-term capital loss deduction because the tax matters partner did not establish Triumph's basis. To claim a loss deduction the taxpayer must establish its basis.[53] Although the tax matters partner alleges that it tracked basis, the evidence shows total basis tracked by entity rather than by specific properties. There is no evidence of Triumph's basis in the property transferred to the Perry entities. Triumph may not deduct the loss.

V.    Bad Debt Deduction

The tax matters partner asserts that Triumph had a short-term capital loss of $51,868 in 2011 from worthlessness of a promissory note executed in its favor by

---

[52]Sec. 165(f).

[53]Sec. 1001(a).

[*47] Mountain Cove.[54]  Section 166(a) allows taxpayers to deduct any debt that becomes worthless within the taxable year.[55]  Section 166(d) limits the general rule and provides that noncorporate taxpayers must treat nonbusiness bad debts as losses from the sale or exchange of a short-term capital asset and can claim the loss only for the year in which the debt becomes wholly worthless.[56]

The parties agree that the Mountain Cove note was a nonbusiness debt.  For Triumph to be entitled to a deduction, the tax matters partner must show identifiable events occurred to render the debt worthless during the year for which Triumph claimed the deduction.[57]  Whether a debt has become worthless is a facts and circumstances determination.[58]  Legal action to enforce payment is not

---

[54]In his answering brief the Commissioner conceded that the transfer was a loan rather than a capital contribution.

[55]Sec. 166(a)(1).

[56]Secs. 166(d)(1)(B), 1211(b), 1212(b); sec. 1.166-5(a)(2), Income Tax Regs.

[57]See Am. Offshore, Inc. v. Commissioner, 97 T.C. 579, 593 (1991).

[58]Am. Offshore, Inc. v. Commissioner, 97 T.C. at 594-595; see also sec. 1.166-2(a), Income Tax Regs.

**[*48]** required where the surrounding circumstances indicate that a debt is worthless and legal action would likely not result in satisfactory relief.[59]

The tax matters partner showed identifiable events that rendered the debt worthless. Mr. Rasmuson explained that Mountain Cove went out of existence in 2011. He determined that the debt was worthless on the basis of his familiarity with the books and records of Mountain Cove. He reviewed the entries for both entities to make sure they reflected the same information. We find his testimony credible. Accordingly, we hold that Triumph may deduct the loss.

## VI. Self-Employment Tax

The Commissioner asserts that Triumph should have reported the $636,608 of gross receipts attributable to the sale of property to Mountain Home in 2011 as self-employment income instead of installment income. Section 1401(a) and (b) imposes a tax on self-employment income. "Self-employment income" generally means "net earnings from self-employment",[60] which in turn includes gross income from a taxpayer's trade or business.[61] Triumph excluded the 2011 gross

---

[59]Am. Offshore, Inc. v. Commissioner, 97 T.C. at 595; sec. 1.166-2(b), Income Tax Regs.

[60]Sec. 1402(b).

[61]Sec. 1402(a); see also SI Boo, LLC v. Commissioner, T.C. Memo. 2015-
(continued...)

**[\*49]** receipts from the net earnings computation and reported the sale as generating a capital gain.[62]

The tax matters partner argues, in one sentence in its reply brief, that Triumph held property for investment instead of in its trade or business. We disagree. The Traverse entities were actively engaged in the Traverse Mountain development during 2011; by the end of that year they had developed 1,900 units. On the basis of our finding that Triumph had income from the proceeds of sale of real property in 2011, which was related to its trade or business, we hold that Triumph should have included that income in its reported net earnings from self-employment.

VII.   Accuracy-Related Penalties

Section 6221 provides that the applicability of any penalty that relates to an adjustment to a partnership item is determined at the partnership level.[63] The determination of partnership items in a partnership-level proceeding is

---

[61](...continued)
19, at \*33.

[62]Because we find that Triumph did not have unreported gross receipts for 2010, Triumph did not fail to report net earnings from self-employment for 2010.

[63]See also sec. 6226(f); sec. 301.6221-1(c), Proced. & Admin. Regs.

[*50] conclusive.[64] But a partner may file a claim for refund to challenge the amount of the computational adjustment or to assert any partner-level defenses that may apply.[65]

Section 6662(a) and (b)(1) and (2) imposes a 20% accuracy-related penalty on any portion of an underpayment of tax that is due to, among other things, any negligence or disregard of rules or regulations or a substantial understatement of income tax. The term "negligence" includes any failure to make a reasonable attempt to comply with the provisions of the Code, and the term "disregard" includes any careless, reckless, or intentional disregard.[66] A taxpayer is negligent if he fails to maintain sufficient records to substantiate the items in question.[67] Negligence is strongly indicated where a taxpayer fails to make a reasonable attempt to ascertain the correctness of a deduction, credit, or exclusion on a return that would seem to a reasonable and prudent person to be "too good to be true"

---

[64]Sec. 6230(c)(4).

[65]Sec. 301.6221-1(c) and (d), Proced. & Admin. Regs.

[66]Sec. 6662(c); Higbee v. Commissioner, 116 T.C. 438, 448 (2001).

[67]See Higbee v. Commissioner, 116 T.C. at 449; sec. 1.6662-3(b)(1), Income Tax Regs.

[*51] under the circumstances.[68] An understatement of income tax is "substantial" when it exceeds the threshold set forth in section 6662(d)(1).

Triumph acted negligently or with disregard of the requirements of section 170 and the regulations thereunder. We have found that the transfer to the city of Lehi was a quid pro quo exchange. Triumph received the concept plan approval and expected approval of its area plan. Nevertheless, Triumph reported that the transfer was a charitable contribution at a fair market value determined by an appraisal with no adjustment for the significant consideration received in the development approvals. Accordingly, we find that Triumph did not make a reasonable attempt to ascertain the correctness of the charitable contribution deduction because it did not adjust the deduction for the consideration received.[69]

The substantial understatement penalty is applicable as it relates to an adjustment to partnership items.[70] Whether the understatement exceeds the applicable threshold for a substantial understatement of income tax is a

---

[68]Sec. 1.6662-3(b)(1)(ii), Income Tax Regs.

[69]See Seventeen Seventy Sherman St., LLC v. Commissioner, at *42-*43.

[70]Sec. 6221; VisionMonitor Software, LLC v. Commissioner, T.C. Memo. 2014-182, at *16.

[*52] computational determination based on the partners' information.[71]

Accordingly, we sustain the Commissioner's section 6662(b)(2) accuracy-related penalty on any portion of an underpayment of tax that is due to a substantial understatement of income tax.

The accuracy-related penalty will not apply to any portion of the underpayment where the taxpayer establishes that it had reasonable cause for that portion and acted in good faith.[72]  The tax matters partner alleges that Triumph had reasonable cause and acted in good faith.  However, the tax matters partner failed to present any evidence that Triumph had reasonable cause and acted in good faith.  Accordingly, we find that the tax matters partner did not establish reasonable cause and good faith at the partnership level.

To reflect the foregoing,

Decision will be entered

under Rule 155.

---

[71]Sec. 301.6221-1(c) and (d), Proced. & Admin. Regs.

[72]Sec. 6664(c)(1); Higbee v. Commissioner, 116 T.C. at 448; Neonatology Assocs., P.A. v. Commissioner, 115 T.C. 43, 98 (2000), aff'd, 299 F.3d 221 (3d Cir. 2002).